## ELI LILLY & CO. v. SCHWEGMANN BROS. GIANT SUPER MARKETS et al.

### Civ. No. 3678.

United States District Court
E. D. Louisiana, New Orleans Division.

Jan. 13, 1953.

Chaffe, McCall, Toler & Phillips, New Orleans, La., Root, Ballantine, Harlan, Bushby & Palmer, New York City, Harry McCall, Jr., New Orleans, La., Everett I. Willis and Ross Reid, New York City, for plaintiff.

Wisdom & Stone, John Minor Wisdom, Saul Stone and Paul O. H. Pigman, New Orleans, La., for defendant.

WRIGHT, District Judge.

The plaintiff, a manufacturer of drug products, seeks an injunction restraining the defendants, operators of two supermarkets in the City of New Orleans, from selling its products below the minimum retail sale price fixed pursuant to the Louisiana Fair Trade Act.[1] Defendants, admitting sales in violation of the act, challenge its constitutionality as well as the constitutionality of the McGuire Act,[2] which exempts state fair trade acts from the provisions of the Sherman Anti-Trust Act.[3]

The Louisiana Fair Trade Act is similar to the fair trade acts now in existence in most states. It provides that no contract relating to the resale of a commodity which bears the trade-mark, brand or name of the producer thereof will violate any law of the state by reason of the fact that the contract gives the producer the right to set the minimum resale price of the commodity. It further provides that where such a contract is entered into, it is unfair competi-

[1]. LSA–R.S. 51:392 et seq.
[2]. 15 U.S.C.A. § 45.
[3]. 15 U.S.C.A. § 1 et seq.

tion, actionable by any person damaged, for any one, whether signer or nonsigner of the contract, to sell the commodity below the price fixed in the contract.

The practice under the fair trade acts is simple. The manufacturer enters into a contract with a retailer under which the manufacturer is given the right to set the minimum resale price of commodities bearing the name of the manufacturer. Thereafter nonsigners, as well as signers, of the contract are prohibited from selling the commodity below the fixed price.

The McGuire Act was passed immediately following the decision of the Supreme Court in Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, in which it was held that the Miller-Tydings amendment[4] to the Sherman Anti-Trust Act did not exempt from the provisions of the Sherman Anti-Trust Act that part of the state fair trade laws relating to nonsigners.

In this litigation there is no contention that the Sherman Anti-Trust barrier is not now completely removed from the operation of the state fair trade laws. The attack here is a broadside one against the constitutionality of the McGuire Act and the Louisiana Fair Trade Act, individually and as they relate to each other, on the ground that they constitute an unlawful delegation of legislative power to private individuals to fix prices without standards and without government supervision and on the further ground that the acts violate the due process clause of the 5th and 14th Amendments.

There is no suggestion in the record nor in the pleadings that defendants are using the plaintiff's products as "loss leaders."[5] The evidence is uncontradicted that defendants made a fair profit[6] in all sales of plaintiff's products below the fair trade price. The evidence is also uncontradicted

that the defendants sell the products of most, if not all, of plaintiff's competitors below the fair trade price. The defendants simply are efficient retailers who pass on the fruits of that efficiency to the buying public in the form of lower prices. Enforcement of the fair trade act would protect other retailers from this type of competition.[7]

Legislation and litigation relating to resale price-fixing have had an eventful history in this country. The controversy points up a basic difference in economic philosophy between that segment of our society which believes in free competition and those who believe that millions of products sold under the name of the manufacturer or producer should be eliminated from competition insofar as that competition relates to resale prices.

The litigious history of this subject begins in 1911 with the landmark case of Dr. Miles Medical Company v. John D. Park & Sons, 220 U.S. 373, 31 S.Ct. 376, 55 L. Ed. 502, in which the Supreme Court held that restraints on the alienation of chattels by means of resale price-fixing agreements were invalid under the common law and the Sherman Anti-Trust Act. After trying unsuccessfully for twenty years to have Congress pass legislation overcoming the effect of the Dr. Miles decision, the proponents of fair trade legislation turned their attention to the state legislatures, before which they have been phenomenally successful. Fair trade legislation exists in forty-five states today.[8]

Prior to the decision of the Supreme Court in Old Dearborn Distilling Co. v. Seagram-Distillers Corp., 299 U.S. 183,[9] 57 S.Ct. 139, 81 L.Ed. 109, state courts had expressed some doubt as to the validity of fair trade legislation. After Old Dearborn in 1936, however, fair trade legislation

4. 15 U.S.C.A. § 1.

5. Merchandise priced below cost.

6. 10 to 15 percent as opposed to 35 to 40 percent under the fair trade price.

7. Actually, the retail dealer associations rather than the manufacturers have been the outstanding protagonists of fair trade legislation before the Congress and the state legislatures. As a matter of fact the affidavits filed by the plaintiff herein suggest the possibility that the manufacturers may be the unwilling proponents of such measures.

8. All except Texas, Missouri and Vermont.

9. This case upheld state fair trade legislation against constitutional attack.

stood unchallenged or approved in all states until recently when the Supreme Courts of Florida and Michigan, while respecting the Old Dearborn decision as to the constitutionality of fair trade legislation under the federal constitution, held fair trade laws invalid under their state constitutions.[10] These two decisions together with Schwegmann v. Calvert, supra, indicate that the whole subject of fair trade legislation may be in line for critical re-examination.[11]

Defendants assert that the Louisiana Fair Trade Law coupled with the McGuire Act gives the plaintiff the uncontrolled and unappealable right to fix the resale price of its products in spite of the fact that the plaintiff has parted with the ownership of the products and even though the products are in the hands of a retailer who has specifically refused to sign retail price contracts with the plaintiff. Defendants therefore contend that these statutes constitute an unlawful delegation of legislative authority to private persons and deny the defendants due process of law in that their right to dispose of merchandise which they own is restricted by private interests. Defendants further contend that in Schwegmann v. Calvert, supra, the Supreme Court

recognized fair trade statutes as authorizing coercive price-fixing and thus impliedly overruled its prior decision in the Old Dearborn case.

That the delegation to private persons of the uncontrolled and unappealable right to fix resale prices of merchandise owned by another is unconstitutional is clear beyond cavil.[12] Consequently, if we were to assume that the merchandise in question was fully owned by the defendants without any residual right inhering in the plaintiff, our task would be an easy one. But the Supreme Court in Old Dearborn said that while the retailer of a commodity bearing a trade-mark, brand or name may own the commodity, the trade-mark, brand or name and the good will which inheres therein belong to the manufacturer, that this good will is property which the manufacturer has a right to protect and that price restriction pursuant to a state fair trade act is "an appropriate means to that perfectly legitimate end, and not as an end in itself." [13] Perhaps after twenty years of experience under fair trade acts, the Supreme Court may conclude that the real purpose of these acts is not to protect the good will of the manufacturer, and that

10. Liquor Store, Inc., v. Continental Distilling Corp., Fla., 1949, 40 So.2d 371; Shakespeare Company v. Lippman's Sporting Goods Co., 1952, 334 Mich. 109, 54 N.W.2d 268.

11. For a change in the British view from an economic standpoint see Report of the Committee on Resale Price Maintenance, Board of Trade, London, June 1949, Cmd. 7696, p. 18 which reads in part:
"Price competition is, in our view, an important factor in the growth of that efficiency and economy in the distributive trades to which our terms of reference draw specific attention * * *
" * * * We have already noted that the development of distribution methods is a dynamic process in which old barriers are constantly being removed and new techniques introduced. These dynamic tendencies are, we believe, still present in our economy, and there is no reason to suppose that there is not still room for further improvement in the distributive system.
"In our view, therefore, it is essential, if the efficiency of distribution as a whole

is to be open to continuous improvement, that positive steps should be taken to create and maintain conditions in which newcomers are free to enter the field, enterprising traders to introduce new methods and lower cost, or more efficient distributors (whoever they may be) given opportunity to offer the public the advantages of reduced prices or improved methods."

12. Fairmont Creamery Co. v. State of Minnesota, 274 U.S. 1, 47 S.Ct. 506, 71 L.Ed. 893; Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940; Panama Refining Company v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L. Ed. 446; Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570; Carter v. Carter Coal Company, 298 U.S. 238, 56 S.Ct. 855, 80 L. Ed. 1160; Olsen v. State of Nebraska, 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305; Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834.

13. 299 U.S. 183, 193, 57 S.Ct. 139, 144, 81 L.Ed. 109.

272

price-fixing under these acts is not an appropriate means to that perfectly legitimate end, but is in fact an end in itself. In other words, it may well be found that the real purpose of fair trade legislation is to protect the retailer from competition with another retailer who, because of his efficient merchandising methods, is able to reduce his distributive costs and consequently his retail prices. That is a matter, however, which addresses itself to the Supreme Court.

While the decision in Schwegmann v. Calvert, supra, may reflect a changing attitude toward resale price-fixing pursuant to fair trade acts, there is nothing in that case, even by dicta, which indicates that the Supreme Court has receded from its position, outlined in Old Dearborn, that good will is a property right which is properly protected by price restrictions fixed pursuant to state fair trade acts. This point simply was not at issue in that case. It is true that in Schwegmann v. Calvert, supra, the Supreme Court characterized price-fixing as to nonsigners as "coercive" thereby indicating that it would no longer follow Old Dearborn insofar as that case held that the acquisition by a retailer of a commodity covered by resale price restrictions is an implied assent to those restrictions. However, the good will property right protection basis of Old Dearborn remains intact. It is dispositive of the issue here.

 On the question of irreparable injury there is an apparent unanimity of opinion to the effect that mere threatened violation of a fair trade law justifies the issuance of an injunction, that the violation itself being unfair competition, no other proof of irreparable injury is necessary.[14] In spite of the facility with which other courts have reached this conclusion, it is difficult for this court to follow. The state fair trade acts provide that violations thereof are actionable only "by any person damaged"[15] and traditionally, before the issuance of an injunction, equity has required proof of pending irreparable injury. No reason is shown why that principle should be departed from here. Threatened irreparable injury must be proved before an injunction can be granted.

 On the surface it would appear that the plaintiff should benefit rather than suffer from defendants' price-cutting. Certainly more of its products would be sold. However, on closer analysis it becomes apparent that the plaintiff actually will suffer unless protected by injunction. The affidavits in evidence taken from retail druggists show that unless the fair trade price on plaintiff's products is protected, the retail druggists will stop selling plaintiff's products and favor products of plaintiff's competitors. This threatened refusal on the part of retailers to sell plaintiff's products may not injure its good will but it will certainly cripple its business, particularly if the retail dealer associations take a uniform position in the matter. Consequently, as long as state fair trade laws are safe from constitutional attack, the manufacturer is not safe from the wrath of the retailer.

Plaintiff's motion for summary judgment is granted.

14. Bristol-Myers Co. v. Picker, 302 N.Y. 61, 96 N.E.2d 177, 22 A.L.R.2d 1203; Guerlain, Inc., v. F. W. Woolworth Co., 297 N.Y. 11, 74 N.E.2d 217; Calvert Distillers Corp. v. Nussbaum Liquor Store, Inc., 166 Misc. 342, 2 N.Y.S.2d 320; Miles Laboratories, Inc. v. Seignious, D. C., 30 F.Supp. 549; James Heddon's Sons v. Callender, D.C., 28 F.Supp. 643; Eastman Kodak Co. v. E M F Electric Supply Co., D.C., 36 F.Supp. 111; Calvert Distillers Corp. v. Stockman, D.C., 26 F. Supp. 73; Borden Co. v. Schreder, 182 Or. 34, 185 P.2d 581; Frankfort Distillers Corp. v. Liberto, 190 Tenn. 478, 230 S.W.2d 971; Burroughs Wellcome & Co. v. Johnson Wholesale Perfume Co., 128 Conn. 596, 597, 24 A.2d 841.

15. LSA–R.S. 51:394.