**SCHWEGMANN BROS. GIANT SUPER MARKETS et al. v. ELI LILLY & CO.**
No. 14440.

United States Court of Appeals Fifth Circuit.
June 30, 1953.
Writ of Certiorari Denied Oct. 19, 1953.
See 74 S.Ct. 71.

Holmes, Circuit Judge, dissented.

John Minor Wisdom, Saul Stone, Paul O. H. Pigman, and Edward B. Benjamin, Jr., New Orleans, La., for appellants.

Harry McCall, Jr., New Orleans, La., Everett I. Willis and Ross Reid, New York City, Chaffe, McCall, Toler & Phillips, New Orleans, La., Root, Ballantine, Harlan, Bushby & Palmer, New York City, for Eli Lilly & Co., appellee.

Before HOLMES, STRUM and RIVES, Circuit Judges.

RIVES, Circuit Judge.

The District Court delivered an able opinion [1] and enjoined the appellants from selling products of the appellee below the minimum retail sale price fixed pursuant to the Louisiana Fair Trade Law.[2] The essential

---

1. Eli Lilly & Company v. Schwegmann Brothers Giant Super Markets, D.C., 109 F.Supp. 269.

2. Louisiana Statutes Annotated—Revised Statutes of 1950, Title 51, Secs. 391 to 396. The original Act bore the following title:

"An Act To protect trade mark owners, distributors and the public against injurious and uneconomic practices in the distribution of articles of standard quality under a distinguished trade mark, brand or name." Act No. 13 of 1936. The law provides in substance that no contract relating to the sale of a commodity which bears the trade mark, brand or name of the producer and which is in fair and open competition with commodities of the same general class produced by others shall violate any law of Louisiana by reason of containing a provision that the commodity shall not be resold at less than the minimum price stipulated under such contract. It further pro-

facts are not in dispute. The appellants concede that the appellee's fair trade prices had been established by contracts entered into in accordance with the Louisiana Fair Trade Law; that appellee's products were in fair and open competition with commodities of the same general class produced by others; and that the appellants, themselves not signers of such a contract, willfully and knowingly disregarded the minimum prices established under contracts between the appellee and other Louisiana retailers. It was established also that the appellants had a uniform mark-up, employed no loss leaders, and indulged in no otherwise predatory practices. The appellants planted their defense squarely upon a challenge to the constitutionality of the Louisiana Fair Trade Law and a further challenge to the constitutionality of the McGuire Act.[3]

The Louisiana Supreme Court has sustained the validity of the Louisiana Fair Trade Law, and its decision is conclusive, insofar as the State constitution is concerned. Pepsodent Co. v. Krauss Co., 200 La. 959, 9 So.2d 303. The appellants contend that the State or Federal act or both together amount to an unconstitutional delegation of a legislative function, violate the due process clause, offend the commerce clause, and stem from self-defeating statutory provisions.

As to the Louisiana Fair Trade Law, the appellants say that it violates the due process clause of the Fourteenth Amendment to the United States Constitution, because it bears no substantial relation to the public welfare, and because it delegates legislative power to private individuals. The same contentions with respect to the Fair Trade Act of Illinois, S.H.A. ch. 121½, § 188 et seq. were considered and rejected by the United States Supreme Court in Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109, (hereafter referred to as the Old Dearborn case); and the same result was reached in The Pep Boys, Manny, Moe & Jack of California, Inc., v. Pyroil Sales Co., Inc., 299 U.S. 198, 57 S.Ct. 147, 81 L.Ed. 122, as to the California Fair Trade Act St.1931, p. 583, § 1; St.1933, p. 793, § 1½. Appellants' grounds for questioning that the Old Dearborn case controls here seem to be an assertion supported by various economic texts that the years of experience in the fair trade acts since Old Dearborn have established that the real purpose of these Acts is not so much to protect the good will of the manufacturer or trade mark owner as it is to protect the

---

vides that willfully and knowingly selling such a commodity at less than such minimum price, whether the person so selling is or is not a party to such a contract, is unfair competition and actionable by any person damaged.

3. Act of July 14, 1952, 82nd Congress, 2nd Session, 66 Statutes 631, 632, 15 U.S. C.A. § 45. The purpose of the McGuire Act was stated as follows:
"It is the purpose of this Act to protect the rights of States under the United States Constitution to regulate their internal affairs and more particularly to enact statutes and laws, and to adopt policies, which authorize contracts and agreements prescribing minimum or stipulated prices for the resale of commodities and to extend the minimum or stipulated prices prescribed by such contracts and agreements to persons who are not parties thereto. It is the further purpose of this Act to permit such statutes, laws, and public policies to apply to commodities, contracts, agreements, and activities in or affecting interstate or foreign commerce." Section 1, 15 U.S.C.A. § 45 note.
According to its sponsor, Representative McGuire:
"The McGuire bill is merely permissive. It says to the States, in effect, that Congress recognizes the rights of the States to enact and make effective policies respecting unfair competition. That is all the McGuire bill does and that is all it is intended to do." 98 Cong.Rec. 4979 (May 7, 1952).
The primary purpose of the McGuire Act was to change, as to future cases, the result reached by the Supreme Court in Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (referred to hereafter as the Schwegmann case). H.R.Rep. 1437, 82nd Congress, 2nd Session, pp. 1–2, U.S. Code Congressional and Administrative News 1952, pp. 2181, 2182.

retailer from competition with other retailers, and, further, that the opinion in the Schwegmann case (Footnote 3, supra) has rendered Old Dearborn obsolete.

The Schwegmann opinion involved no constitutional question and, hence, did not refer to Old Dearborn. The Schwegmann case related to the interpretation of the Sherman Anti-Trust Act as amended by the Miller-Tydings Act, Act of July 2, 1890, c. 647, Sec. 1, 26 Stat. 209, Act of Aug. 17, 1937, c. 690, Title VIII, 50 Stat. 693, 15 U.S.C.A. § 1, with respect to the enforcement of state fair trade laws in interstate commerce. The Court decided that the intention of Congress was to authorize interstate enforcement against the signers of an express contract or agreement but not against non-signers. To meet that decision, as has been said, Congress passed the McGuire Act.

The appellants rely strongly upon the claimed inconsistency in language between the Old Dearborn and Schwegmann opinions. The Schwegmann case referred to non-signers as being coerced, whereas Old Dearborn said that willful and knowing non-signers could fairly be treated as implied assenters. The Schwegmann opinion characterized the State Fair Trade Statute as involving price fixing, whereas Old Dearborn had said that the law was not primarily a price fixing statute. In comparing the two opinions, it must be borne in mind that Old Dearborn was dealing with questions of constitutionality, whereas the Schwegmann case was dealing only with statutory interpretation. There is no implication in Schwegmann that Congressional approval of enforcement against non-signers would be unconstitutional, the implications of the opinion are to the contrary.[4]

■ The trend of economic practices as tending to show that fair trade acts are concerned more with the protection of distributors than with the protection of the producer or owner of the trade mark are matters, it seems to us, for legislative, not for judicial, consideration. Indeed, the title of the Louisiana Fair Trade Law (Footnote 2, supra) expressly includes "distributors" among the classes intended to be protected. We cannot say that the legislature was not authorized to consider distributors as in a similar position to licensees of the trade mark or brand with a direct economic interest in it as regards the sales of the trade-marked or branded article. Whether the distributors were to be protected, as well as the manufacturers or trade mark owners, was a matter, it seems to us, addressed to legislative discretion and not subject to review by courts. We have no judicial concern with the economic and social wisdom of any feature of the law, but solely with its constitutionality.

■ Whatever weakening effect on Old Dearborn may have been caused by Schwegmann's frank characterization of State fair trade statutes as involving price fixing against non-signers is more than off-set, it seems to us, by the weakening also of the broad concept against the validity of legislative price fixing assumed in Old Dearborn. For "the well-settled general principle that the right of the owner of property to fix the price at which he will sell it is an inherent attribute of the property itself, and as such is within the protec-

4. "The fact that a state authorizes the price fixing does not, of course, give immunity to the scheme, *absent approval by Congress*." 341 U.S. at page 386, 71 S.Ct. at page 746.

"*Had Congress desired* to eliminate the consensual element from the arrangement and to permit blanketing a state with resale price fixing if only one retailer wanted it, we feel that different measures would have been adopted—*either a non-signer provision would have been included or resale price fixing would have been authorized without more*." 341 U.S. at page 390, 71 S.Ct. at page 748.

"It should be remembered that it was the state laws that the federal law was designed to accommodate. Federal regulation was to give way to state regulation. When state regulation provided for resale price maintenance by both those who contracted and those who did not, and the federal regulation was relaxed only as respects 'contracts' or agreements,' the inference is strong that *Congress left the noncontracting group to be governed by preexisting law*." 341 U. S. at page 395, 71 S.Ct. at page 751. (Emphasis in each quotation supplied.)

tion of the Fifth and Fourteenth Amendments". 299 U.S. at page 192, 57 S.Ct. at page 143, Old Dearborn cited Tyson-Brother-United Theatre Ticket Offices v. Banton, 273 U.S. 418, 429, 47 S.Ct. 426, 71 L.Ed. 718; Chas. Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 537, 43 S.Ct. 630, 67 L.Ed. 1103; Ribnik v. McBride, 277 U.S. 350, 48 S.Ct. 545, 72 L.Ed. 913; Williams v. Standard Oil Co., 278 U.S. 235, 49 S.Ct. 115, 73 L.Ed. 287; New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747. As pointed out in Olsen v. State of Nebraska ex rel. Western Reference & Bond Ass'n, 313 U.S. 236, 244–246, 61 S.Ct. 862, 85 L.Ed. 1305, the Tyson, Ribnik and Williams cases can no longer be deemed controlling authority. See also, Lincoln Federal Labor Union No. 19129 v. Northwestern Iron & Metal Co., 335 U.S. 525, 536, 537, 69 S.Ct. 251, 93 L. Ed. 212; Day-Brite Lighting, Inc., v. Missouri, 342 U.S. 421, 423, 72 S.Ct. 405, 96 L.Ed. 469. It is interesting to note that Mr. Justice Sutherland who delivered the opinion of the Court in Old Dearborn had been among the dissenting Justices in Nebbia v. New York, 291 U.S. 502, at page 539, 54 S.Ct. 505, at page 517, 78 L.Ed. 940, where the Court concluded:

> "Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

Appellants argue that there is no provision in the Louisiana Fair Trade Law requiring that fair trade contracts be made by the trade mark or brand owner himself, and that fair trade laws could not constitutionally require non-signers to observe minimum prices stipulated without participation or authorization by the trade mark or brand owner. That argument is addressed to a hypothetical case and the decision of that question, we think, should await the clarification and construction of the Louisiana statute by the Louisiana courts. We are dealing in this case with fair trade prices established by contracts to which the trade mark owner, the appellee, is a party. See Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 462, 65 S.Ct. 1384, 89 L.Ed. 1725; Rescue Army v. Municipal Court of City of Los Angeles, 331 U.S. 549, 568, et seq., 67 S.Ct. 1409, 91 L.Ed. 1656; Watson v. Buck, 313 U.S. 387, 401–402, 61 S.Ct. 962, 85 L.Ed. 1416.

■ The Louisiana legislature has defined with particularity the type of commodity with respect to which fair trade prices may be established and enforced; namely, "a commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer of the commodity and which is in fair and open competition with commodities of the same general class produced by others". It was, we think, within the province of the legislature to assume that economic laws constitute a sufficient restraint against capricious or arbitrary price fixing by the producer. As pointed out long ago by Louis D. (later Mr. Justice) Brandeis, the producer "establishes his price at his peril—the peril that if he sets it too high, either the consumer will not buy or, if the article is, nevertheless, popular, the high profits will invite even more competition".[5] We agree with the learned District Judge that Old Dearborn still controls and, further, that, if it is to be overruled, that can be done only by the Supreme Court.

■ Old Dearborn, of course, did not consider the challenges which are addressed to the McGuire Act. The argument is that Article 1, Sec. 1, of the Constitution vests in Congress legislative power which cannot be delegated, and that Article 1, Sec. 8, grants to Congress powers over interstate commerce which cannot be surrendered. The McGuire Act did not delegate the power of Congress to say what fair trade legislation should be permitted in interstate commerce, but spelled out in detail the type of fair trade statute to which the Congressional consent was to apply by specifying the standards and safeguard which a

5. Brandeis, "Cut-Throat Prices—The Competition That Kills", Harper's Weekly, November 15, 1913.

state act must embody in order to qualify for interstate effectiveness. As to interstate commerce, it is now settled that the power of Congress is so plenary that it may exercise that power by permitting the states to regulate phases of interstate commerce. Prudential Insurance Co. v. Benjamin, 328 U.S. 408, 424, 66 S.Ct. 1142, 90 L.Ed. 1342. The most recent decision, United States v. Public Utilities Comm., 345 U.S. 295, 304, 73 S.Ct. 706, indicates that, even when the subject would be a direct burden on commerce, the states may act when Congress has specifically granted permission for the exercise of state power.

 The appellants argue, however, that both the McGuire Act and the Louisiana Fair Trade Law are inoperative against non-signers, because they contain self-defeating contradictions in terms, that the maintenance of uniform resale prices, which results from the power of a producer to impose prices on non-contracting parties, is horizontal price fixing expressly excluded from the protection of those laws. Appellants' argument would render the statutes meaningless as to non-signers. The intention of Congress and the intention of the Louisiana Legislature are clearly that restrictions on the non-signers, when imposed as the result of a contract between a producer and a distributor, are to be given effect. What is prohibited is horizontal price fixing agreements "between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other." The McGuire Act. We find nothing in the Louisiana Fair Trade Law or in the McGuire Act self-defeating or violative of the Constitution of the United States. The judgment is, therefore,

Affirmed.

HOLMES, Circuit Judge (dissenting).

The question presented on this appeal is as to the constitutionality of the Louisiana Fair Trade Law, LSA–R.S. 51:391–396, insofar as it imposes price-fixing agreements upon persons who are not parties to a fair-trade contract. The appellants con-

tend that such so-called fair trade price-fixing under a federal law violates the Fifth Amendment, and under a state law violates the Fourteenth Amendment. The federal statutes here involved are the Federal Trade Commission Act, as amended by the Act of July 14, 1952, 66 Stat. 631, 15 U.S.C.A. § 45; and the Sherman Act, as amended by the Act of August 17, 1937, 50 Stat. 673, 693, 15 U.S.C.A. § 1.

The appellants contend that the Louisiana Fair Trade Act and the above-cited federal act of July 14, 1952, separately and as they relate to each other, constitute an improper delegation of legislative power to private individuals to fix prices without legal standards or governmental supervision. A diabetic, they say, pays $2.08 for a bottle of Lilly's insulin at Schwegmann's, $2.83 for an identical bottle at so-called fair trade prices. There is no suggestion that the appellants are using the appellee's products as loss leaders, though they sell below the prices of identical commodities in the manufacturer's contract with other retail dealers. As well stated by the court below [109 F.Supp. 270]: "The defendants simply are efficient retailers who pass on the fruits of that efficiency to the buying public in the form of lower prices. Enforcement of the fair trade act would protect other retailers from this type of competition."

We are not necessarily concerned with the alleged unconstitutionality of any phase of the federal act, because a much narrower issue is presented to us with reference to the Louisiana statute, the determination of which might dispose of this case. The vulnerable part of the state statute is that provision of Section 394, Title 51, which denounces, as unfair competition and actionable, the sale of any identified commodity by a person not a party to the contract at less than the minimum contract price. The Congress may use its power over interstate commerce to support local policies of the states, but it cannot authorize state regulation of commerce except by methods that are consistent with due process, that have a substantial relation to the public weal, and that are not arbitrary or capricious. The use of pri-

vate property and the making of private contracts are generally free from governmental interference, but they are subject to public regulation when the public interest requires it. These limitations apply to the power of a state to regulate prices in commercial transactions between individuals.

The appellants did not sign the contract that fixed the prices involved in this controversy, and they did not expressly or impliedly agree to the contents of that instrument; but the judgment under review restrains them from offering for sale or selling the commodities manufactured by appellee at less than the minimum prices stipulated in contracts entered into by appellee with other retailers, pursuant to the Louisiana Fair Trade Law, "or at prices less than those which may be shown in any future retail resale price schedules" issued by the appellee in connection with such contracts; and it further enjoins them from making any rebates, refunds, discounts, or concessions of any kind or character for the purpose of, or which will result in, decreasing the said stipulated retail prices, save in four special cases not pertinent here. These prices may be raised or lowered by the appellee in contracts with other retailers, and the appellants must conform to any changes in prices that affect their merchandise. Not only that, the appellants must keep posted as to the retail resale minimum prices of all other commodities handled by them which bear, or the labels or containers of which bear, the trade mark, brand, or name of the appellee, and which are in fair and open competition with commodities of the same general class produced by others; and they must require an agreement from the second vendee that he will not, in turn, resell any such commodity at less than the minimum price stipulated by the vendor or by the vendee.

In Old Dearborn Distributing Co. v. Seagram Distillers Corp., 299 U.S. 183, at page 191, 57 S.Ct. 139, at page 143, 81 L.Ed. 109, the court said: "In respect of the due process of law clause, it is contended that the statute is a price-fixing law, which has the effect of denying to the owner of property the right to determine for himself the price at which he will sell. Appellants invoke the well-settled general principle that the right of the owner of property to fix the price at which he will sell it is an inherent attribute of the property itself, and as such is within the protection of the Fifth and Fourteenth Amendments [citing authorities]. These cases hold that, with certain exceptions, which need not now be set forth, this right of the owner cannot be denied by legislative enactment fixing prices and compelling such owner to adhere to them. But the decisions referred to deal only with legislative price fixing. They constitute no authority for holding that prices in respect of 'identified' goods may not be fixed under legislative leave by contract between the parties. The Illinois Fair Trade Act does not infringe the doctrine of these cases."

The above case and The Boys, Manny, Moe & Jack of California, Inc., v. Pyroil Sales Co., Inc., 299 U.S. 198, 57 S.Ct. 147, 81 L.Ed. 122, would require an affirmance of the lower court's decision in the instant case; but the later decision of Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, has opened the door for a reconsideration of the constitutionality of fair trade laws as price fixing statutes. Assailing the constitutionality of the Old Dearborn case, the appellants contend that price-fixing imposed on nonsigners under the Louisiana Fair Trade Law is invalid as to them, because the legislation prescribes no legal standards, is wholly coercive as to non-signers, and affords them no opportunity to be heard. They quote as follows from a later decision: "If a distributor and one or more retailers want to agree, combine, or conspire to fix a minimum price, they can do so if state law permits. * * * When they seek, however, to impose price fixing on persons who have not contracted or agreed to the scheme, the situation is vastly different. That is not price fixing by contract or agreement; that is price fixing by compulsion. That is not following the path of consensual agreement; that is resort to coercion. * * * Contracts or agreements convey the idea of a cooperative arrangement, not a program whereby recal-

citrants are dragged in by the heels and compelled to submit to price fixing." Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 388 and 390, 71 S.Ct. 747.

After the Schwegmann decision, supra, which dealt with the Louisiana Fair Trade act, the above-cited act of July 14, 1952, was passed. The latter is known as the Federal Fair Trade Act; and, if it did not drag the appellants in by the heels, it sought to remove them from the sanctuary of the Sherman Anti-Trust Act. A non-signer provision was included and a provision whereby a state may be blanketed with resale price-fixing if only one retailer wants it, provided this feature of the Louisiana statute is constitutional. Nevertheless, we think it was not the intention of the federal statute to delegate to the states any power but merely to free commerce from some of the federal statutory restrictions that were mentioned in the Schwegmann case. The federal constitutional barriers remain. In Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S., 373, at pages 405 and 409, 31 S.Ct. 376, at page 384, 55 L.Ed. 502, Mr. Justice Hughes said:

"Whatever right the manufacturer may have to project his control beyond his own sales must depend not upon an inherent power incident to production and original ownership, but upon agreement. * * * The complainant having sold its product at prices satisfactory to itself, the public is entitled to whatever advantage may be derived from competition in the subsequent traffic."

The reasoning of the Old Dearborn decision was predicated upon the assumption that non-signers had consented to the arrangement. Price-fixing between the parties by agreement is very simple to the extent that anti-trust statutes are relaxed; but it would be a fabrication to assume that the Schwegmanns have consented to the prices fixed by the appellee. Mr. John Schwegmann testified: "When I went into the drug business the mark-up in that business was so high you wouldn't believe one man would overcharge his fellow-man that kind of a mark-up." His testimony is that his mark-up is dependent on the cost of doing business, that he is making money in his drug department, and that all fair-trade articles are sold for less than fair-trade prices except the appellee's, upon which the court ordered him to raise the prices. He explained how he arrived at the cost of his merchandise (to which he added the profit he wanted to make), and he said: "We have done that every year since we have been in business, and I have made more money than I ever dreamed I could make." He asked: "If I could do it, why couldn't the drug stores do it?"

The appellee is engaged in the manufacture, distribution, and sale of pharmaceutical products. There are more than a hundred other companies in this same field. Many of them manufacture products that are identical or equivalent to those of appellee. The latter makes almost one-thousand products in some seven thousand different pharcaceutical forms, and promotes their sale and distribution on a nation-wide scale. It spends millions annually for this purpose, including advertisements. If the prices were fixed by it by consent on all of its trade-marked merchandise, and the same were done not only by all of the one-hundred other drug manufacturers but by all other makers of trade-marked articles in forty-five states having fair-trade laws, it is apparent that we would have not only consensual vertical but consensual horizontal price-fixing on a nation-wide scale except in three states.

If the appellee may agree with a single retailer to fix minimum prices on innumerable branded commodities, a thousand other trade-mark owners may do the same thing. These prices may be changed at will by the parties without giving non-signers a hearing. Legal standards are still required for a state or federal governmental agency to fix prices, however eroded may be the maxim that a delegated authority cannot be delegated (Delegata postestas non potest delegari). Panama Refining Co. v. Ryan, 293 U.S. 388, 415 et seq., 55 S.Ct. 241, 79 L.Ed. 446. Fair trade laws, which have been given an exemption from anti-trust statutes to validate them, remain subject to constitutional requirements. Even joint state and federal action is limited by those provisions

of the constitution that forbid action altogether. Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 434, 66 S.Ct. 1142, 90 L.Ed. 1342.

Price-fixing, like rate-making, is a legislative function, but no legislature has fixed any prices in this controversy. The federal legislature has taken its hands off of it, and left the states free to act. The Louisiana legislature has fixed no prices as to trademarked commodities, but has authorized the vendors and vendees to do it. All of which was within the police power of the state; but when it dragged in every retailer, alive and kicking, that had notice of the contract, the Louisiana law went too far. If it did not make each of the contracting parties a judge in his own case, it made the vendor and vendee of one commodity the arbiters of the property rights of every stranger to the contract who owned commodities of the same brand.

The office of a trade-mark is to give notice of the identity of the producer of an article. It should be distinguished from a trade name, which is more properly allied with the good will of a business. In the Old Dearborn case, the court held, as to non-signers with notice, that the unfair competition consisted in their reselling, under the trade-mark of the producer, below the minimum price of a contract to which they were not parties. The answer to this is that the manufacturer used his trademark to induce the original sale. He had his name and brand on the original package when he sold his product and put it into the channels of trade. If a non-signer should use that trade-marked container to sell some other product, he would be guilty of unfair competition, but if he sells the same product, in the same container, under the same name, that was used by the manufacturer, he breaches no contract, commits no fraud or deception, and practices no unfair competition, merely by taking a smaller profit than some other retailer was willing to accept. Such competition is not unfair; it is the life of trade; and to stifle trade in any commodity is to foster a monopoly, which the law abhors. Sunbeam Corp. v. Wentling, 3 Cir., 192 F.2d 7.

It does not appear from whom the appellants acquired or may acquire the appellee's products, nor how the good will of the manufacturer's business was or will be injured by free competition among retailers. There is no proof or presumption of wrongdoing on the part of the appellants. They have lowered prices in trade-marked commodities; this is the extent of their offending. To make it a *tort per se* for retail druggists and whiskey dealers to compete with each other openly and fairly in trade-marked commodities is fanciful and arbitrary; and to say that horizontal price-fixing contracts are unlawful but vertical price-fixing agreements are legal though monopolistic is to summarize the effect of the Louisiana law, the title to which is an attractive misnomer.

As to forty-five states and several Congresses having complacently approved in principle the constitutionality of the fair-trade statutes, the answer is that it is true; they have done this *sub silentio;* but the constitutional reasoning of all of them is found in the Old Dearborn opinion. It is brief, and is no better or worse than it was when written in 1936. It holds that prices in respect of trade-marked goods may be fixed by contract between the parties. It adopts a rule that was "upset * * * in a series of cases, of which Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502, is an example." [299 U.S. 183, 57 S.Ct. 142.] It tacitly admits that if any state legislature or any delegated state agency should fix prices as these contracting parties have done, the right of the owner to fix his own prices would be violated; but, it says, this constitutes "no authority for holding that prices in respect of 'identified' goods may not be fixed under legislative leave by contract between the parties." When it comes to non-signers, the opinion confuses the use of a brand or trade-mark with the good will of a business. It proceeds upon the theory that the sale of identified goods at less than the prices fixed by the owner of the mark or brand is an assault upon the good will of the manufacturer's business. If that premise is false, the whole structure of fair-

trade statutes tumbles like a house of cards. If a satisfied customer is the best advertisement, and good will is the disposition of a pleased customer to return to the place where he has been well treated, which are almost aphorisms, then sales below the minimum contract prices will enhance the good will not only of the retailer but of the producer of trade-marked commodities. If water runs down hill and the property of fire is to burn, monopolistic prices injure good will and cause resentment in the hearts of the people who are oppressed by them. They feel like those of old who were required to make brick without straw. The average man or house-wife will find no comfort in the fact that the prices of food or drugs are kept high by vertical rather than horizontal agreements.

Trade-mark and good will are not synonymous terms; but the Old Dearborn opinion says: "Appellants own the commodity; they do not own the mark or the good will that the mark symbolizes." The court ignored the fact that the producer put its name and mark on the container (sometimes on the product) and launched it in commerce. The court said that there was nothing to prevent a purchaser from selling the commodity alone at any price, and nothing to preclude a purchaser from removing the mark or brand and then selling the commodity at his own price, with a vague proviso that the good will of the producer must not be used to aid the sale. This proviso must be distinguished from the three statutory conditions wherein sales are excepted from minimum price agreements. The statutory exceptions are not involved here, and the Old Dearborn opinion maintains that the retailer may separate the physical property, which he owns, from the good will of the manufacturer's business, which is the property of another, and then sell the commodity at his own price, provided, etc. The court says ownership of the good will "remains unchanged, notwithstanding the commodity has been parted with"; and then it says that the fair-trade statute interferes "only to protect that good will against injury." Let us now ascertain what physical property was sold by the appellee, and what incorporeal property was retained by it.

The appellants bought more than the loose, disattached, commodity; they bought the package, bottle, or container, in which it was delivered, with the inscriptions on the same. This tangible property was put into the channels of trade by the producer, and title to it passed to the retailers; but the latter acquired nothing intangible, like the good will of the vendor's business, or the right to use the trade mark on other commodities sold by them. No covenants ran with the sale of the merchandise like covenants sometimes run with the land conveyed. The doctrine of *caveat emptor* did not require the buyers to beware of price-fixing agreements between the vendor and some other retailer. If the appellants made no contract, they did not need to underwrite the covenants of their competitors. A trade mark is not always evidence of good quality or symbolic of good will; but ordinarily is only representative of the origin of a commodity or the identity of its maker. Marks that simply indicate the quality of articles do not constitute a valid trade mark, and no property may be acquired therein.

We have here sales, for the purpose of resale, of commodities in trade-marked containers; and it was not unfair competition, injurious to the producer's good will, for retailers who had agreed to no prices to resell the same commodities in the same containers at their own prices without defacing the trade mark. Without mentioning the practical impossibility of removing the trade mark from all aspirin tablets and from all the containers of drugs in stock, there are state and federal statutes forbidding the obliteration or concealment of trade marks, and even requiring the display of the manufacturer's, packer's, or distributor's name on drugs. 27 U.S.C.A. § 205(e); 21 U.S.C.A. §§ 331, 352. 21 U.S.C.A. § 352(a) says: "A drug * * * shall be deemed, to be misbranded—(a) If its labeling is false or misleading in any particular", * * * or 352(i) (3) "if it is offered for sale under the name of another drug."

A *sine-qua-non* of the constitutionality of the Louisiana Fair-Trade Law is the right of a non-signer to remove the trade mark of the manufacturer and sell the commodity at his own price. If that right is unduly restricted by law or by impractical factual conditions, it may fairly be regarded as non-existent, both of which postulates are true in the instant case. To hold otherwise with reference to the trade mark on every aspirin tablet would give the husks of justice to the retailer and minimum price control to the manufacturer. Whiskey was the product involved in Old Dearborn, the defacing of the trade mark on which is now prohibited by state and federal laws. The same is true as to some drugs involved in this case and covered by the injunction. It is a legal, factual, and economic impossibility for the owner of tangible personal property to part completely with the possession thereof and the title thereto, and yet retain control of the price thereof in perpetuity. The effort of dead hands to control the disposition of real estate was thwarted at common law by the rule against perpetuities; and the effort of living hands, or corporate hands that never die, to control the price of commodities in the hands of remote purchasers should suffer a similar fate. If distillers and drug manufacturers may make consensual vertical price fixing agreements with retailers that are binding on non-signers, there are plenty of trade-marked breakfast foods, canned goods, and other edible commodities, the producers of which might blanket the nation with vertical minimum price-fixing agreements. What a tangled web this would be! Cf. LSA-R.S. 40:608; 40:617; 40:622; 40:627; 51:242; 51:243; 51:522.

With the anti-trust statutes out of the way, there is no unlawful delegation of price-fixing authority under the Louisiana Fair-Trade Statute so long as it is consensual; but, to the extent that it is coercive, it is lacking in due process, confiscatory, and void. Being entirely coercive as to the appellants, the judgment appealed from should be reversed; otherwise the original Sherman Act may be whittled away by legislative exemptions and exceptions, administrative orders and processes, trade-mark devices, patent rights, judicial decisions, and consensual price-fixing under brigaded state and federal legislation. Therefore, I respectfully dissent.