PARKE, DAVIS & COMPANY
v.
G. E. M., INC.

U. S. TIME CORPORATION
v.
G. E. M., INC.

J. B. WILLIAMS COMPANY,
a body corporate,
v.
G. E. M., INC., a body corporate.

PARKER PEN COMPANY
v.
G. E. M., INC.

ABBOTT LABORATORIES, a body
corporate,
v.
G. E. M., INC.

MILES LABORATORIES, INC.
v.
G. E. M., INC.

MEADE, JOHNSON & COMPANY
v.
G. E. M., INC.

CORNING GLASS WORKS
v.
G. E. M., INC.
Civ. A. Nos. 13179, 13290, 13214, 12843,
13116, 13026, 13044, 13278.

United States District Court
D. Maryland.
Jan. 9, 1962.

Jesse Slingluff, Baltimore, Md., and James C. McKay, Washington, D. C., for plaintiff Parke, Davis & Co.

Solomon Liss, Baltimore, Md., for plaintiff U. S. Time Corp.

Charles Mindel, Buckmaster, White, Mindel & Clarke, Baltimore, Md., for plaintiff J. B. Williams Co.

J. Cookman Boyd, Jr., Baltimore, Md., for plaintiff Parker Pen Co.

J. Nicholas Shriver, Jr., and J. Paul Bright, Jr., Baltimore, Md., for plaintiff Abbott Laboratories.

J. Cookman Boyd, Jr., Baltimore, Md., for plaintiff Miles Laboratories, Inc.

J. Cookman Boyd, Jr., Baltimore, Md., for plaintiff Mead, Johnson & Co.

David R. Owen, Semmes, Bowen & Semmes, Baltimore, Md., for plaintiff Corning Glass Works.

Joseph L. Nellis, Washington, D. C., and Stanley B. Frosh, Bethesda, Md., for defendant G. E. M., Inc.

R. DORSEY WATKINS, District Judge.

In these eight cases, manufacturer-distributors have sued the defendant for alleged violation of the Maryland Fair Trade Act, Maryland Code of Public General Laws, Article 83, section 107, for alleged sales, offering for sale and ad-

vertising for sale, of fair traded articles at below the established fair trade prices.

Defendant is a subsidiary of a chain of so-called "closed door" department stores which sell only to a card-bearing segment of the public, such as federal, county, city and state employees, and members of the armed services, and their families.

Defendant sells plaintiffs' merchandise, together with other well- or less well-known consumer products, at prices generally lower than those prevailing in conventional department stores; and particularly, below the established fair trade prices of plaintiffs' products. Defendant at no time entered into any agreement, express or implied, with any manufacturer, wholesaler, or other seller, under which it has agreed to maintain any particular price, fair-traded or otherwise, on any particular product, sold in its Maryland stores. Defendant is thus a "nonsigner" under the Maryland Fair Trade Act or the McGuire Act, 15 U.S. C.A. § 45.

Each of these suits is based upon allegations of diversity of citizenship, and the existence of the jurisdictional amount of $10,000 as being in controversy.

Defendant has, with exemplary zeal, by motions to dismiss, put in issue all, or substantially all, defenses which competent counsel are accustomed, even if only for the record, to interpose in such cases. These include a denial that the requisite jurisdictional amount is involved; questions as to whether or not the products involved are in "free and open competition" with other like products; whether plaintiffs have exercised reasonable diligence in enforcing their fair-trade contracts, or have abandoned their fair-trade policies; whether or not plaintiffs are carrying on an interstate or intrastate business in Maryland without registering or qualifying to do business therein (Eli Lilly & Company v. Sav-On-Drugs, Inc., 1961, 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288) as required by Maryland law; whether sales by plaintiffs to Post Exchanges under agreements permitting (or not prohibiting) such Post Exchanges to resell at below established fair-trade prices in Maryland, are an abandonment of, or estoppel to assert, fair-trade prices against other retailers, and especially defendant; and whether the nonsigner clause of the Maryland Law is unconstitutional. All of these, except the last two—Post Exchanges, and the validity of the nonsigner clause—depend upon the particular facts applicable to each plaintiff individually, and no useful purpose would be served by a general consideration or discussion of them. This memorandum will, accordingly, be confined to these two important questions—the effect of selling to Post Exchanges, without a requirement that resales therefrom be at not less than fair-trade prices; and the validity of the nonsigner clauses. The first presents to this court no difficulty whatever; the second is the source of exceeding travail.

### Sales to Post Exchanges, without Imposition of Fair Trade Price Restriction on Resale.

The decisions are uniform, and completely persuasive, that state fair-trade acts do not, and cannot, apply to Government Post Exchanges. In substance, these cases hold that a Post Exchange is Government-operated, on Government property, or that the activities of Post Exchanges are Governmental, the object of which "is to provide * * * sources where soldiers can obtain their ordinary needs at the lowest possible prices," (a not unworthy goal, I would assume, for even ordinary citizens; or District Judges, whose salaries are fixed); and for either or both reasons, sales from Post Exchanges are not subject to State fair-trade statutes. Standard Oil Co. of California v. Johnson, 1942, 316 U.S. 481, 484–485, 62 S.Ct. 1168, 86 L.Ed. 1611; Sunbeam Corp. v. Horn, S.D.Ohio 1955, 149 F.Supp. 423; Sunbeam Corp. v. Central Housekeeping Mart, Inc., 1954, 2 Ill.App.2d 543, 120 N.E.2d 362; Opinion of Minnesota Attorney General, CCH Trade Regulation Report ¶ 67, 590.

### Validity of the Nonsigner Clause.

The defendant attacks: (1) 15 U.S.C.A. § 45(a) (3), the nonsigner provision of the McGuire Act, as a denial of due process of law in violation of the Fifth Amendment, and a delegation of legislative power contrary to Article 1, Sections 1 and 8, cl. 18 of the Federal Constitution;

(2) 15 U.S.C.A. § 45(a) (4) providing in part that enforcement of any right of action against a nonsigner shall not constitute an unlawful burden or restraint upon, or interference with commerce as an usurpation of judicial power, in violation of Article III, Sections 1 and 2, of the Federal Constitution; and

(3) Article 83, Section 107 of the Maryland Code of Public General Laws, the nonsigner provision of the Maryland Fair Trade Act, as a denial of due process of law and of the equal protection of the laws, contrary to the Fourteenth Amendment, Section 1, of the Federal Constitution.

Were these questions being presented for the first time, I would have no hesitation in holding with the defendant, and would have difficulty in seeing how a different result would be possible.

(a) There seems to me to be something obviously and inherently wrong in allowing A and B to determine at what price C, D, etc. may resell goods purchased by them. I am fully familiar with third party beneficiary contracts. Even in these, the third party may, but is not compelled to, accept the benefit. A third party "detrimentee" contract is an entirely different animal; one that I would class as ferae naturae.

(b) That the effect of the McGuire Act would be to permit compulsion upon unwilling retailers was stated, with greater force than I would normally use, by the majority of the Supreme Court in Schwegmann Bros. v. Calvert Distillers Corp., 1951, 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035:

"* * * If a distributor and one or more retailers want to agree, combine, or conspire to fix a minimum price, they can do so if state law permits. Their contract, combination, or conspiracy—hitherto illegal —is made lawful. They can fix minimum prices pursuant to their contract or agreement with impunity. When they seek, however, to impose price fixing on persons who have not contracted or agreed to the scheme, the situation is vastly different. That is not price fixing by contract or agreement; that is price fixing by compulsion. That is not following the path of consensual agreement; that is resort to coercion.

(Page 388, 71 S.Ct. page 747).

\* \* \* \* \* \*

"* * * Contracts or agreements convey the idea of a cooperative arrangement, not a program whereby recalcitrants are dragged in by the heels and compelled to submit to price fixing." (Page 390, 71 S.Ct. page 748).

(c) If two or more retailers, who wished to maintain minimum prices on a commodity, did so pursuant to agreement, they would violate the antitrust laws. But under the McGuire and Maryland Acts, one manufacturer and one retailer can compel all other competitive retailers to do, whether they want to or not, something which they could not do voluntarily—maintain prices.

Entirely apart from the anomaly that a person can be *legally required to do by coercion* what he could *not legally do voluntarily*, the result approximates "horizontal" price fixing through a single "vertical" contract. This apparently was anticipatorily condemned in Schwegmann in the following language:

"* * * Elimination of price competition at the retail level may, of course, lawfully result if a distributor successfully negotiates individual 'vertical' agreements with all his retailers. But when retailers are *forced* to abandon price competition, they are driven into a compact in

violation of the spirit of the proviso which forbids 'horizontal' price fixing. * * * " (Page 389, 71 S.Ct. page 748; emphasis not supplied).

(d) The result is price fixing. This is obvious, and is so characterized in both the majority and dissenting opinions in Schwegmann. (341 U.S. at 385, 71 S. Ct. at 746; "a price-fixing scheme;" "price-fixing contracts"; "the price-fixing scheme"; at 386, 71 S.Ct. at 746, "prices fixed"; "price fixing"; "price fixing"; at 387, 71 S.Ct. at 747, " 'contract' fixing the resale price" "price-fixing 'contract' "; "price fixing"; "price fixing"; "price fixing"; at 388, 71 S.Ct. at 747, "Fix a minimum price"; "fix minimum prices"; "price fixing"; "price fixing by compulsion"; at 389, 71 S.Ct. at 748, "price fixing"; "price fixing"; at 390, 71 S.Ct. at 748, "resale price fixing"; "resale price fixing"; "price fixing"; at 395, 71 S.Ct. at 751, "fix retail prices"; dissent at 398, 71 S.Ct. at 752, "fix a minimum resale price").

(e) The authority to fix prices for all retailers is delegated to a minority of two—one distributor and one retailer. When prices are fixed by legislation, criteria are established, and the fairness of the prices is subject to judicial review. Here the right to fix prices is delegated to two members of the public—irresponsible in that there is no one to whom they must respond; there is no limitation as to the nature, type or kind of commodity; there is no public board or official who has any supervision, or to whom any report is required; there is no provision for review by any official, or court, of the price so fixed; and no standard or guide is imposed or required to exist as to the price to be fixed, or the necessity for it.

No logomachy of withdrawing barriers or removing legal restraints can change the fact that power is obtained by, or given or "delegated" to, two individuals to fix not only their own prices by contract, but those of all other retailers by coercion.

(f) The figment of a single contract with one of hundreds or thousands of competitive dealers is a rather gossamer subterfuge to give the verisimilitude of a negotiated price. Obviously one retailer—incompetent, negligent, grasping, or with too high an overhead—can easily be found who would be delighted to agree upon a price that would enable him, with his built-in limitations, to operate at a profit; and to insure this profit by being able to compel his more capable, industrious, less grasping and less pretentious competitors to sell at the same price; to remove them as price competitors.

Unless "good will" means the highest price that can safely be fixed, this single contract is no measure of good will, and should not, under the guise of maintenance of good will, be foisted onto competitors—who may appraise this "good will" differently; or upon the public, which may appraise the "good will" differently still.

To me it would be a more honest approach (and if the justification for price fixing is maintenance of the distributor's good will it would be just as effective and more honest) for the distributor, without any contract, simply publicly to announce: "I place the value of my good will at $X per article, and therefore, regardless of the price at which I sell to anyone, no one may resell below $Y".

(g) Good will is usually defined as "the probability that the customers of the old establishment will continue their patronage." 38 C.J.S. Good Will § 1, page 949. It would seem to me that the good will to which the distributor may look is the probability that retailers will continue to deal with him; and that in turn the good will of the retailer is the probability that his customers will continue to deal with him, and will introduce new customers.

The trade-mark of the distributor of course remains his, and no purchaser should be permitted to palm off another's goods. But how the distributor can continue to own a good will after the article with which it is associated ceases to be his, is difficult if not impossible to follow.

How is this good will to be established? Presumably, it is reflected in the price the goods would bring on the open market. But if the distributor, by virtue of a monopoly, or by ability to fix prices by agreement, arrangement, contract, combination or collusion with a single buyer can fix the price for others, that does not reflect good will in any ordinary sense, any more than the price that a person compelled to sell will take, or a person compelled to buy will pay, represents fair market value.

But these questions have not been presented for the first time, and I probably am not free to decide them as I would like. They have, in whole or in part, been passed upon many times by Federal courts, and nearly uniformly adversely to the position of defendant; although the very decided recent trend of State courts has been to invalidate the nonsigner clause.

### The Maryland Decisions.

There can be no question but that the Maryland Court of Appeals in Goldsmith v. Mead Johnson & Co., 1939, 176 Md. 682, 7 A.2d 176, 125 A.L.R. 1339, held the nonsigner provisions of the Maryland Act to be consistent with the Maryland Constitution. From a technical and academic point of view the decision might be suspect in that the Maryland Court of Appeals appeared to rely heavily upon portions of Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 1936, 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109 which dealt with the sections of the Illinois Act applicable to those who had *signed* Fair Trade contracts. Compare 176 Md. 687, 7 A.2d 178 with 299 U.S. 190, 191–192, 57 S.Ct. 143. However, this holding on the nonsigner clause was reaffirmed, although perhaps by way of dictum, in Home Utilities Co. v. Revere Copper and Brass, Inc., 1956, 209 Md. 610, 614–615, 122 A.2d 109, 110.

This court is therefore bound to assume that Maryland holds, or would hold, the nonsigner provision of the Maryland Law to be legal and valid under the Maryland Constitution.

### The Federal Constitution.

At the risk of repeating what has become more than a "Twice Told Tale", resale price maintenance or so-called Fair Trade Laws had their start in the depression years, at first purporting to validate only agreements between the immediate contracting parties. These significantly failed in effectiveness, and there was added the nonsigner clause. Both the contract provision and nonsigner clauses came before the United States Supreme Court and were upheld, as to the Illinois Act in the case of Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 1936, 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109, and as to the California Act (verbatim except for a typographical error) in Pep Boys, Manny, Moe & Jack, of California v. Pyroil Sales Co., 1936, 299 U.S. 198, 57 S.Ct. 147, 81 L.Ed. 122, as valid exercises of the state police power, and as not transgressing the due process and equal protection clauses of the Fourteenth Amendment. In 1937 Congress passed the Miller-Tydings amendment to 15 U.S.C.A. § 1, to exempt Fair Trade contracts, valid under State laws, from the ban of the Sherman Act, 15 U.S.C.A. § 1 et seq. In Schwegmann Bros. v. Calvert Distillers Corp., mentioned above, 1951, 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, 19 A.L.R.2d 1119, a majority of the Supreme Court, in rather excoriating language, held that the Miller-Tydings amendment validated State Fair Trade legislation only to the extent that it made Fair Trade contracts enforceable between the contracting parties, and that the Sherman Act still precluded State legislation from making price fixing arrangements enforceable against nonsigners. In the McGuire Act of 1952, amending 15 U.S.C.A. § 45, Congress endeavored to remove this barrier to the enforcement of nonsigner clauses. This statute was held constitutional by the Fifth Circuit in Schwegmann Bros. Giant Super Markets v. Eli Lilly & Co.,

5 Cir. 1953, 205 F.2d 788 [1], cert. den. 1953, 346 U.S. 856, 74 S.Ct. 71, 98 L.Ed. 369, rehearing denied 346 U.S. 905, 74 S.Ct. 217, 98 L.Ed. 404.

The Fifth Circuit Schwegmann decision has set the pattern for substantially the entire subsequent trend of decisions for the District Courts and Circuit Courts of Appeal. The majority of the Fifth Circuit pointed out that the Supreme Court Schwegmann decision dealt with statutory construction, and not a constitutional question, and emphasized that despite the inconsistency in language of the Old Dearborn and Schwegmann opinions (Schwegmann—that nonsigners were coerced; Old Dearborn that they could be treated as implied assenters [2]; Schwegmann repeatedly referred to the "fair-trade" agreements as price fixing; Old Dearborn as not "primarily" price fixing) the implications of the majority in Schwegmann were that Congressional approval of enforcement against nonsigners would be constitutional (citing 341 U.S. at pages 386, 390, 395, 71 S.Ct. at pages 746, 748, 751).[3]

The Fifth Circuit has reaffirmed its holding, simply by reference, in Sunbeam Corp. v. Masters of Miami, Inc., 5 Cir. 1955, 225 F.2d 191. Similar results were reached in Norman M. Morris Corp. v. Hess Bros., Inc., 3 Cir. 1957, 243 F.2d 274, 64 A.L.R.2d 750, and in Sunbeam Corp. v. Richardson, 6 Cir. 1957, 243 F. 2d 501.[4]

The Ninth Circuit has similarly decided in sustaining the validity of a local Fair Trade Act (of the Territory, now State, of Hawaii) in G. E. M. Sundries

1. A two-to-one decision, with a strong dissent by Circuit Judge Holmes.

The prescience of the decision is somewhat impaired by the holding of the Court of Appeals (205 F.2d at 790):

"The Louisiana Supreme Court has sustained the validity of the Louisiana Fair Trade Law, and its decision is conclusive, insofar as the State constitution is concerned. Pepsodent Co. v. Krauss Co., 200 La. 959, 9 So.2d 303."

In Dr. G. H. Tichenor Antiseptic Co. v. Schwegmann Bros. Giant Super Markets, 1956, 231 La. 51, 90 So.2d 343, 60 A.L.R.2d 410, the Louisiana Supreme Court invalidated the Louisiana Act as an unconstitutional delegation of legislative power to private persons, saying:

" * * * courts will not hesitate to strike down legislation vesting in private persons the right to determine the state of things upon which the effect of the law depends as this is legislative delegation in its most obnoxious form. See Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 and City of Alexandria v. Alexandria Fire Fighters Ass'n, supra" [220 La. 754, 57 So.2d 673, 674].

See also A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 553, 55 S.Ct. 837, 853, 79 L.Ed. 1570.

2. How far should implication control over facts negating such implication?

3. To this court there is an obvious discrepancy between the denunciation of the effect of the nonsigner clause by the majority, and their indication that their ruling was based only upon a statutory construction that Congress had not intended by the Miller-Tydings amendment to remove nonsigner provisions from the Sherman Act. However, this court would assume that, if the majority had believed that Congress could not so legislate, they would at least have referred to this as explanatory of its omission. The minority would have read the Miller-Tydings amendment as broad enough to include nonsigner clauses—but there is no hint this would have been beyond the power of Congress.

However, this court knows of no direct attempt to meet the argument of the majority, quoted above, that the nonsigner clause would result in invalid "horizontal" price fixing.

4. The Sixth Circuit bases this largely upon the "strong implication" which it purported to find in United States v. McKesson & Robbins, 1956, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209, considered by the Sixth Circuit as stating that the Supreme Court "was not only bound by the limitations marked by Congress, beyond which price fixing may not go, but was also bound to construe such limitations strictly, since resale price maintenance is a privilege restrictive of a free market." (243 F.2d at 503). With all due respect, I do not understand how strict construction of the *limitations* beyond which price fixing *may not go* implies, strongly or otherwise, the validity of one of the most extreme extensions of price fixing.

Co. v. Johnson & Johnson, 9 Cir. 1960, 283 F.2d 86. The validity of State Fair Trade Acts under the Fourteenth Amendment was implicitly, albeit cursorily, recognized in Lee-Wilson, Inc. v. General Electric Co., 1 Cir. 1955, 222 F.2d 850 and Seagram-Distillers Corp. v. New Cut Rate Liquors, Inc., 7 Cir. 1955, 221 F.2d 815, cert. den. 1955, 350 U.S. 828, 76 S.Ct. 59, 100 L.Ed. 740.

The District Courts have generally been in accord. General Electric Co. v. Wender, S.D.W.Va.1957, 151 F.Supp. 621; General Electric Co. v. Hess Bros., Inc., E.D.Pa.1957, 155 F.Supp. 57; Esterbrook Pen Co. v. San Juan F. Vilarino 5 & 10, Inc., D.P.R.1956, 144 F.Supp. 309; Remington Arms Co. v. Gatling, W.D.Pa.1955, 128 F.Supp. 226; Union Carbide & Carbon Corp. v. White River Distributors, Inc., E.D.Ark.1954, 118 F. Supp. 541.

Of possible significance is the fact that since the passage of the McGuire Act, every appeal to the United States Supreme Court from a decision of the highest State court upholding the constitutionality of a nonsigner provision has been dismissed by the United States Supreme Court for want of a substantial Federal question. Standard Drug Co. v. General Electric Co., 1961, 368 U.S. 4, 82 S.Ct. 16 (1960, 202 Va. 367, 117 S.E. 2d 289); Masters, Inc. v. General Electric Co., 1954, 348 U.S. 892, 75 S.Ct. 215, 99 L.Ed. 701; S. Klein on the Square, Inc. v. Lionel Corp., 1954, 348 U.S. 860, 75 S.Ct. 88, 99 L.Ed. 677 (last two, 307 N.Y. 229, 120 N.E.2d 802); Grayson-Robinson Stores, Inc. v. Lionel Corp., 1954, 348 U.S. 859, 75 S.Ct. 87, 99 L.Ed. 677 (15 N.J. 191, 104 A.2d 304). Only the last three deal with the McGuire Act. The first did not directly involve the constitutionality of the McGuire Act, which question, standing alone, could have been raised only on a petition for certiorari, not on appeal. Since, however, the validity of the McGuire Act alone could have made operative the nonsigner provision of the New Jersey statute in interstate commerce, such validity may be considered as indirectly raised. At least, the United States Supreme Court has not reached out for an opportunity to pass upon the validity of the McGuire Act in review of State court decisions.

In view of the decisions above cited, this court, while completely unpersuaded, does not feel that it, as a trial court, should set itself up as above its numerous superiors and equals in authority. It therefore reluctantly finds against the defendant in its defense based upon the invalidity of the nonsigner clause.

As, however, the point has not been decided by the Fourth Circuit, and as this court feels so strongly upon it, the court will, if requested, sign an order overruling this defense but incorporating the provisions of U.S.C. Title 28, § 1292 (b); and if an application for appeal be made thereunder, will stay proceedings in this court.