GENERAL ELECTRIC COMPANY, PLAINTIFF-RESPOND-
ENT, v. PACKARD BAMBERGER & CO., INC., A NEW
JERSEY CORPORATION, DEFENDANT-APPELLANT.

Argued October 26 and November 16, 1953—Decided December 21,
1953.

Mr. *John W. Griggs* argued the cause for the appellant (Messrs. *Morrison, Lloyd & Griggs,* attorneys).

Mr. *Nicholas Conover English* argued the cause for the respondent (Mr. *Godfrey K. Preiser, Jr.,* of counsel; Messrs. *McCarter, English & Studer,* attorneys).

The opinion of the court was delivered by

BURLING, J.   This is an appeal from an injunction ordered by the Superior Court, Chancery Division, against a retailer under the New Jersey Fair Trade Act.   The plaintiff, General Electric Company, a corporation of the State of New York, brought the action against the defendant, Packard Bamberger & Co., Inc., a New Jersey corporation, to restrain the latter from selling the plaintiff's products at prices less than prices fixed in resale price maintenance contracts effected between the plaintiff and retail dealers in New Jersey subsequent to July 14, 1952.   A preliminary injunction was granted in favor of the plaintiff by order of the Superior Court, Chancery Division, on July 17, 1953.   The defendant's appeal therefrom was addressed to the Superior Court, Appellate Division, but prior to hearing there certification was allowed on our own motion.

The pertinent facts in this case are not in dispute. The defendant admits, as alleged in the complaint, that it is a corporation of New Jersey engaged in the sale, at retail, of electrical appliances at Hackensack, New Jersey, and that the plaintiff, a New York corporation, manufactures electrical appliances and distributes them to retail dealers throughout the country, and throughout the State of New Jersey. The complaint charged that the plaintiff since July 14, 1952 had entered into "Fair Trade Agreements," *i. e.*, resale price maintenance contracts, with retail dealers in New Jersey stipulating minimum resale prices for products of the plaintiff's manufacture, and on December 10, 1952 and February 20, 1953 had notified the defendant of the details thereof in writing. The defendant in its answer admitted that it had received the notifications referred to and admitted the contents thereof as stated in the exhibits attached to the complaint. In its brief on this appeal the defendant admits that its policy is to sell merchandise at minimum prices, that it had no contract with the plaintiff although it had notice that the plaintiff had price-fixing contracts with other retailers, and that it had sold the plaintiff's products at less than plaintiff's minimum prices. These admissions, for the purpose of this appeal, substantially summarize the facts set forth in the affidavits submitted to the trial court by both parties on the plaintiff's application for the order granting the interlocutory injunction, which is the order appealed in this cause.

As hereinbefore stated, the plaintiff instituted this action against the defendant in the Superior Court, Chancery Division, to obtain the remedy of injunctive relief to protect or enforce its resale price maintenance agreements, and the defendant appeals from the order granting interlocutory restraint in favor of the plaintiff.

The question involved on this appeal is whether a non-participating retailer may be compelled by an injunction issuing out of a state court to abide by resale price maintenance provisions established in contracts between the manufacturer having interstate business activity and other retailers,

or in other words whether a "nonsigner" is protected from the enforcement of resale price maintenance agreements by the Congressional power to regulate interstate commerce under *U. S. Const., Art.* I, *Sec.* 8.

The plaintiff admitted on this appeal that the products with which the present controversy is concerned moved and presently move through interstate commerce. The facts in the case support this admission and consequently the necessity arises for consideration of the interstate commerce aspects of the appeal. *Cf. Hoffmann-La Roche, Inc., v. Weissbard,* 11 *N. J.* 541, 548–550 (1953).

The matters for decision here reduce themselves to one question of general public importance, namely: Is the nonsigner provision of the Fair Trade Act of New Jersey, *R. S.* 56:4–3 *et seq.,* as amended by *L.* 1938, *c.* 165, applicable to products moving into New Jersey through interstate commerce by virtue of the McGuire Act, *P. L.* 542, 82*nd Congress, 2nd Session, c.* 745 (July 14, 1952)? We are of the opinion that it is.

Resale price maintenance, in principle and practical application, has long been a subject of dispute, the intricacies of which are not presented for dissection on this appeal. A few precedents must be considered however, in order to reach the point of decision in this case.

█ It is settled in New Jersey that contracts for price maintenance between manufacturers, wholesalers and retailers constituted unlawful restraint of trade at common law. *Hoffmann-La Roche, Inc., v. Weissbard, supra* (11 *N. J.,* at p. 547); *Pazen v. Silver Rod Stores, Inc.,* 130 *N. J. Eq.* 407, 411–413 (*E. & A.* 1941). The same philosophy was expressed in *Dr. Miles Med. Co. v. John D. Park & Sons Co.,* 220 *U. S.* 373, 31 *S. Ct.* 376, 55 *L. Ed.* 502 (1911). The United States Supreme Court in the *Dr. Miles* case, *supra,* held that the manufacturer may not, in the absence of contract or statutory right, even though the restriction be known to purchasers, fix prices for future sales. Mr. Justice Hughes in the *Dr. Miles* case, *supra,* stated that the earlier

doctrine of the common law with respect to contracts in restraint of trade "has been substantially modified in adaptation to modern conditions" (*220 U. S.*, at *page* 406, 31 *S. Ct.*, at *page* 384, 55 *L. Ed.*, at *page* 518), and a restraint may be upheld if found reasonable both with respect to the public and to the parties. However, the principles of the common law have not been fully abolished and remain applicable under some circumstances. See *Pazen v. Silver Rod Stores, Inc., supra.*

The common-law rule was modified by statute in New Jersey by the enactment of *L.* 1913, *c.* 210, *p.* 377 (effective April 1, 1913), which prohibited persons and firms dealing therein from "depreciating the value" of trade-marked products "in the public mind" and from discriminating against the same, *inter alia,* "by price inducement." This 1913 statute was held to have set up "a new standard of business morals" in derogation of the common law. See *Ingersoll v. Goldstein,* 84 *N. J. Eq.* 445 (*Ch.* 1915). The statute was amended by *L.* 1915, *c.* 376, and by *L.* 1916, *c.* 107; as so amended it was carried over into the *Revised Statutes* in 1937 as *R. S.* 56:4–1, 2. The former Court of Chancery upheld these acts as not imposing unreasonable restraints on interstate commerce in *Ingersoll & Bro. v. Hahne & Co.,* 88 *N. J. Eq.* 222 (*Ch.* 1917); *Id.,* 89 *N. J. Eq.* 332 (*Ch.* 1918). The rationale of these decisions was that the 1913 act and its amendments were enacted under the police power of the State to protect the use of a trade name or good will, and were not offensive to the Sherman Anti-Trust Act (*July* 2, 1890, *c.* 647, 26 *Stat.* 209, see 15 *U. S. C. A., sec.* 1 *et seq.*) and Clayton Act (*October* 15, 1914, *c.* 323, 38 *Stat.* 730, see 15 *U. S. C. A., sec.* 12 *et seq.*).

In 1935 New Jersey, as had many other states, enacted a "Fair Trade Act." This statute, in practical effect a supplement to the 1913 act, *supra,* although not so framed, was enacted as *L.* 1935, *c.* 58. It was reenacted in the *Revised Statutes,* effective December 20, 1937, as *R. S.* 56:4–3 *et seq., supra,* and was amended by *L.* 1938, *c.* 165 (in respects not here pertinent), and by *L.* 1940, *c.* 230 (in relation to

purchase of books by designated nonprofit agencies and organizations, provisions inapplicable to the question involved on this appeal).

There were appeals concerning the constitutionality (otherwise than as respecting interstate commerce) of the state fair trade acts such as the New Jersey statute, *L.* 1935, *c.* 58, *supra.* See *Johnson & Johnson v. Weissbard,* 121 *N. J. Eq.* 585, 587 (*E. & A.* 1937); *Bourjois Sales Corporation v. Dorfman,* 273 *N. Y.* 167, 7 *N. E.* 2d 30, 110 *A. L. R.* 1411 (*Ct. Apps.* 1937). These constitutional questions were resolved by the United States Supreme Court in *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.,* 299 *U. S.* 183, 57 *S. Ct.* 139, 81 *L. Ed.* 109, 106 *A. L. R.* 1476 (1936), wherein it was held that the Fair Trade Act of Illinois (also enacted in 1935) constituted no denial of due process of law or equal protection of the law and was no unlawful delegation of power to private persons to control the disposition of property of others. The former Court of Errors and Appeals of New Jersey, in the *Johnson & Johnson* case, *ubi supra,* and the New York Court of Appeals, in the *Bourjois* case, *supra,* declared that the *Old Dearborn* case, *supra,* was dispositive and expressly controlling on these questions.

The next step in the development of the law relating to the enforcement of resale price maintenance agreements under the protection of state "fair trade" laws was taken in the form of the passage on August 17, 1937 of the Miller-Tydings Act, amendatory of the Sherman Anti-Trust Act, *supra,* by the Congress of the United States. (*August 17, 1937, c.* 690, *Title* VIII, 50 *Stat.* 673; see 15 *U. S. C. A., sec. 1, supra.*) This amendatory federal legislation was held to be applicable only to the extent of immunization of voluntary contracts prescribing minimum prices from the prohibitory provision of the federal "anti-trust" legislation. *Schwegmann Bros. v. Calvert Distillers Corporation,* 341 *U. S.* 384, 71 *S. Ct.* 745, 95 *L. Ed.* 1035, 19 *A. L. R.* 2d 1119 (1951). We followed the *Schwegmann Bros.* case, *supra,* in *Hoffmann-La Roche Inc., v. Weissbard, supra* (11 *N. J.* 541),

wherein Mr. Justice Heher, speaking for this court, stated (*p.* 547):

"The Miller-Tydings Act grants but a limited immunity from the mandate of the Sherman Act against price restraints. It immunizes purely voluntary contracts or agreements prescribing minimum resale prices for the specified trademarked or branded commodities in interstate commerce. But, unlike the State Fair Trade Law, this act does not have a nonsigner clause; and minimum price-fixing contracts are still unenforceable against noncontracting retailers in the field of interstate commerce. The consensual element is fundamental in the statutory immunity. 'When state regulation provided for resale price maintenance by both those who contracted and those who did not, and the federal regulation was relaxed only as respects "contracts or agreements," the inference is strong that Congress left the noncontracting group to be governed by pre-existing law.' *Schwegmann Bros. v. Calvert Distillers Corporation* \* \* \*."

and (*p.* 550):

"\* \* \* the Sherman Act, as thus amended, forbids coercive conformance to the minimum price schedule by the noncontracting retailers. The Sherman Act 'left no area of its constitutional power unoccupied; it "exercised 'all the power it possessed.'" ' "

In the *Hoffmann-La Roche Inc.*, case, *supra*, and the companion case of *Johnson & Johnson v. Charmley Drug Co.*, 11 *N. J.* 526, 540 (1953), we reached similar conclusions and held "The Supremacy Clause of the Federal Constitution governs here." (*U. S. Const., Art.* VI, *par.* 2). In these two cases and in our comparable decision in *Johnson & Johnson v. Weissbard*, 11 *N. J.* 552 (1953), we held that we were not called upon to assess the plaintiff's rights under the McGuire Act, *supra*, which had been adopted after the appeals in the said three cases were taken.

We are now called upon expressly to determine the effect of the McGuire Act, *supra*, in relation to the "nonsigner" provision of the Fair Trade Act of New Jersey.

The McGuire Act, *supra* (*P. L.* 542, *supra*, approved July 14, 1952), insofar as the provisions are necessarily pertinent to the present matter, amended section 5(a) of the

Federal Trade Commission Act (see 15 *U. S. C. A., sec.* 45) to include the following provisions:

"(3) Nothing contained in this Act or in any of the Antitrust Acts shall render unlawful the exercise or the enforcement of any right or right of action created by any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia, which in substance provides that willfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements whether the person so advertising, offering for sale, or selling is or is not a party to such a contract or agreement, is unfair competition and is actionable at the suit of any person damaged thereby.

(4) Neither the making of contracts or agreements as described in paragraph (2) of this subsection, nor the exercise or enforcement of any right or right of action as described in paragraph (3) of this subsection shall constitute an unlawful burden or restraint upon, or interference with, commerce."

The proponents of the McGuire Bill (*HR* 5767) urged its adoption as "recognition by the Federal Government of statutes which legislatures of various states have already enacted into law." See *U. S. Code, Congressional and Administrative News,* 1952, *p.* 2194. The Federal Trade Commission and the Justice Department opposed its adoption, the former reporting that "The new principle introduced by this bill is that the Congress shall specifically approve the so-called nonsigner clause." *Ibid.,* p. 2182. These expressions, while resort thereto is unnecessary as a basis for our judgment, bear out the specific language of the McGuire Act as adopted, *supra,* namely, approbation of the "statute, law, or public policy *now* or hereafter in effect in any State * * *." (Emphasis supplied). In addition, the purpose is specifically stated in the McGuire Act. The preamble thereof states the purpose is to protect the rights of the states to enact "fair trade" acts as regulations of their internal policy, and the "* * * further purpose * * * to permit such statutes, laws and public policies to apply to commodities, contracts, agreements, and activities in or affecting interstate or foreign commerce." Compare *Backman, Price Practices and Price Policies* (1953),

chapter 14, pp. 418 et seq.; 1952 *Annual Survey of American Law* (1952), *Trade Regulation, pp.* 281 et seq.

■ The defendant contends that by its plain terminology the New Jersey Fair Trade Act is intended solely to reach intrastate commerce. Such a contention is without merit. The applicable decisions of the courts of this State, see *Johnson & Johnson v. Weissbard, ubi supra* (11 *N. J.* 552, at *p.* 554), and cases there collated, clearly show that the language used by the Legislature in the 1935 act was intended to apply to all sales made in New Jersey, whether in the course of interstate or intrastate commerce. The preclusion against enforcement of the New Jersey Fair Trade Act against interstate commerce was brought about by the judicial decisions finding the Congressional purpose either to withhold consent to, or to suspend the exercise of, the State's police power. *Cf. B. R. Waldron & Sons Co., Inc., v. Milk Control Board,* 131 *N. J. L.* 267, 272 (*Sup. Ct.* 1944), affirmed 131 *N. J. L.* 388 (*E. & A.* 1944). The State has been held constitutionally authorized to fix prices for the protection of the public interest, although the state rule yields to the extent that it is in conflict with a federal law. *Helena Rubenstein, Inc., v. Charline's Cut Rate, Inc.,* 135 *N. J. Eq.* 145, 149 (*E. & A.* 1944).

■ The foregoing authorities do not reach the present question, namely, whether a state statute in order to have effect must be reenacted after the relaxation of the federal restriction against its operation with respect to interstate commerce. Under the circumstances of the state and federal legislation involved herein we are of the opinion that reenactment of the state statute is not necessary.

■ There is respectable authority for this determination. It is stated that "Where a state statute is declared unconstitutional or invalid because it is in conflict with federal legislation, the state statute is in effect merely unenforceable or suspended by the existence of the federal legislation." I *Sutherland, Statutory Construction* (3rd ed., *Horack*, 1943), sec. 2027, p. 501; *Field, The Effect of an Unconstitutional Statute* (1935), p. 286 et seq. Consequently, con-

tinues Sutherland's work, "the repeal of the federal statute reinstates or revives the state law without an express reenactment by the state legislature," and the same holds true where by express enactment Congress removes an obstacle to the operation of state legislation. I *Sutherland, Statutory Construction, ubi supra, pp.* 501–502. This principle, of course, does not apply where the state statute is independently violative of the State and Federal Constitutions. *Ibid. Cf.* 11 *Am. Jur., Constitutional Law, sec.* 151, *p.* 833; *Rottschaefer on Constitutional Law* (1939), *secs.* 151–152, *pp.* 286–290; I *Willoughby on the Constitution of the United States* (2nd ed. 1929), *sec.* 7, *p.* 11; *sec.* 74, *p.* 125; II *Id., sec.* 579, *pp.* 964–966.

■ The United States Supreme Court has often expressed itself on the interpretation and effect of the "supremacy clause" of the United States Constitution (*Art.* VI, *par.* 2, *supra*). Where state powers and federal powers are distinct no doubts arise, yet "like the intervening colors between white and black" these powers may "approach so nearly as to perplex the understanding, as colors perplex the vision in marking the distinction between them." *Re Rahrer (Wilkerson v. Rahrer)*, 140 *U. S.* 545, 11 *S. Ct.* 865, 867, 35 *L. Ed.* 572, 575 (1891). In the *Rahrer* case, *supra*, there was involved a state restriction against the sale of liquor, and a subsequent enabling act passed by Congress. The United States Supreme Court held (140 *U. S.,* at *page* 565, 11 *S. Ct.,* at *page* 870, 35 *L. Ed.,* at *page* 578):

"This is not the case of a law enacted in the unauthorized exercise of a power exclusively confided to congress, but of a law which it was competent for the state to pass, *but which could not operate* upon articles occupying a certain situation until the passage of the act of congress. That act in terms removed the obstacle, and we perceive no adequate ground for adjudging that a re-enactment of the state law was required before it could have the effect upon imported which it had always had upon domestic property." (Emphasis supplied.)

*Cf. Butler v. Goreley,* 146 *U. S.* 303, 13 *S. Ct.* 84, 36 *L. Ed.* 981 (1892). The underlying philosophy of the *Rahrer* case,

*supra,* was reiterated in *Southern Pacific Co. v. State of Arizona,* 325 *U. S.* 761, 65 *S. Ct.* 1515, 89 *L. Ed.* 1915 (1945), in which it was further stated that "Congress has undoubted power to redefine the distribution of power over interstate commerce" and "may either permit the states to regulate the commerce in a manner which would otherwise not be permissible" or "exclude state regulation even of matters of peculiarly local concern which nevertheless affect interstate commerce" (325 *U. S.,* at *page* 769, 65 *S. Ct.,* at *page* 1520, 89 *L. Ed.,* at *page* 1925).

Further clarification of these principles was expressed in *Freeman v. Hewit,* 329 *U. S.* 249, 67 *S. Ct.* 274, 277, 91 *L. Ed.* 265, 272 (1946). The United States Supreme Court in the *Freeman* case, *supra,* drew a distinction between direct taxes on interstate commerce and local police regulations, insofar as constitutionality of a state enactment is concerned, holding that "in the necessary accommodation between local needs and the overriding requirement of freedom for the national commerce, the incidence of a particular type of State action may throw the balance in support of the local need because interference with the national interest is remote or unsubstantial" in comparison with the vital local problem. Compare *Joseph v. Carter & Weekes Stevedoring Co.,* 330 *U. S.* 422, 67 *S. Ct.* 815, 91 *L. Ed.* 993 (1947). The law under the commerce clause of the United States Constitution has been "fashioned by the Court," *i. e.,* the United States Supreme Court, to reconcile competing demands of the State and Federal Governments. *Richfield Oil Corp. v. State Board of Equalization,* 329 *U. S.* 69, 67 *S. Ct.* 156, 160, 91 *L. Ed.* 80, 89 (1946). In obedience to this philosophy state regulations which do not impose discrimination *against* interstate commerce or specify the *mode* in which it shall be conducted but forbid discrimination have been upheld. See *Bob-Lo Excursion Co. v. Michigan,* 333 *U. S.* 28, 68 *S. Ct.* 358, 92 *L. Ed.* 455, 464 (1948).

The principles laid down in the *Rahrer* case seem to be in accord with the more recent decisions of the United

States Supreme Court insofar as the philosophy of the law declared in the field of interstate commerce is concerned. Although the power of the Congress of the United States over interstate commerce may be exclusive as to a direct statutory regulation of interstate commerce as such, the states are authorized, under the pertinent decisions of the United States Supreme Court hereinbefore discussed, namely *Re Rahrer, supra; Butler v. Goreley, supra; Southern Pacific Co. v. State of Arizona, supra; Freeman v. Hewit, supra; Joseph v. Carter & Weekes Stevedoring Co., supra; Richfield Oil Corp. v. State Board of Equalization, supra; and Bob-Lo Excursion Co. v. Michigan, supra,* to enact regulations which affect all business done in the state, some of which regulations if reasonable are held not burdensome to interstate commerce, and some of which are held to be inoperative (but not void) until Congress signifies its consent to the application thereof to interstate commerce. Views comparable to the views of this court as expressed in this opinion have been stated in *Schwegmann Bros. Giant Super Markets v. Eli Lilly & Co.,* 205 *F. 2d* 788 (*C. A.* 5 1953), certiorari denied 74 *S. Ct.* 71, 98 *L. Ed.* —— (1953), rehearing denied 74 *S. Ct.* 217 (1953). *Cf. Raxor Corp. v. Goody,* 121 *N. Y. S. 2d* 882, 887 (*Sup. Ct.* 1953); *Sunbeam Corp. v. MacMillan,* 110 *F. Supp.* 836, 842 (*D. C. Md.* 1953).

In a recent decision in *Grayson-Robinson Stores v. Oneida, Limited,* 209 *Ga.* 613, 75 *S. E. 2d* 161 (*Sup. Ct.* 1953), certiorari denied 74 *S. Ct.* 39, 98 *L. Ed.* —— (1953), the Georgia Supreme Court expressed the conclusion that no life was given to the Georgia Fair Trade Act by the McGuire Act, *supra,* nor by the Miller-Tydings Amendment to the Sherman Anti-Trust Act, *supra.* Our conclusions as hereinbefore expressed are otherwise. Compare *Lionel Corporation v. Grayson-Robinson Stores,* 27 *N. J. Super.* 54 (*Ch. Div.* 1953).

For the reasons expressed the judgment of the Superior Court, Chancery Division, is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.