**UNION CARBIDE & CARBON CORP.**

v.

**WHITE RIVER DISTRIBUTORS, Inc.**

**No. B–237.**

United States District Court,
E. D. Arkansas, N. D.

Feb. 8, 1954.

542

Eichenbaum, Walther, Scott & Miller, Little Rock, Ark., for plaintiff.

Wright, Harrison, Lindsey & Upton, Little Rock, Ark., W. D. Murphy, Jr., Batesville, Ark., for defendant.

LEMLEY, District Judge.

This cause comes on for final hearing before the Court, and is submitted upon the pleadings, oral testimony taken before the Court, including testimony taken in connection with plaintiff's motion for a preliminary injunction, documentary evidence, and written briefs.

Plaintiff, a New York corporation, has brought this action against the defendant, an Arkansas corporation, to restrain the latter from selling the well known automobile anti-freeze solution, "Prestone", which is manufactured by the plaintiff, at retail prices less than those prescribed by a so-called "fair trade" agreement executed on September 17, 1952, by 555 Incorporated, one of the

plaintiff's wholesale distributors, and Basil E. Butler's Esso Service, a retail dealer, both of Little Rock. By an amendment to its complaint the plaintiff further seeks a declaratory judgment to the effect that the defendant is bound by said agreement, and may not sell Prestone below the prescribed prices. Jurisdiction of this Court is predicated upon diversity of citizenship, the requisite jurisdictional amount being present; and the plaintiff's claim is based upon Section 6 of the Arkansas Fair Trade Act [1].

It is alleged in the complaint that the plaintiff is engaged in the manufacture, sale and distribution throughout the United States and in the State of Arkansas of an anti-freeze product or commodity contained in a metal container, which bears the "distinctive registered trade-mark 'Prestone' "; that for many years said trade-mark has been duly registered in the Patent Office, and that plaintiff is the sole owner thereof; that said product has been and still is in fair and open competition in Arkansas with similar products produced and distributed by others; and that the plaintiff has expended large sums of money in advertising and promoting the sale of said products and has established a valuable reputation and good will for its trade-mark. Plaintiff next alleges the execution of the "fair trade" agreement between 555 Incorporated and Butler's Esso Service; a copy of this agreement is attached as an exhibit to the complaint, and it appears therefrom that the retailer agreed with the distributor that the former would not re-sell Prestone at less than certain prices, subject to certain exceptions which will presently be mentioned. The prescribed re-sale prices were as follows: $3.75 per gallon in gallon cans; $4 per gallon in quart cans; and $1.00 per quart can. The contract provided that these prices should not apply to sales "made to Government agencies or to consumers buying for industrial or fleet use, or to sales made by Union Carbide and Carbon Corporation or its subsidiary companies or by distributors or dealers to their employees"; further exceptions were made with respect to cases in which the retailer was closing out his stock in good faith and for the purpose of discontinuing handling the product, and with respect to cases in which the goods were damaged or deteriorated in quality and notice of that fact was given to the public.

Plaintiff further alleges that after the execution of said agreement notices of its existence and of the prescribed retail prices were issued to the trade, and that in 1952 and 1953 the defendant received such notices, but that in spite of such notice it sold Prestone at retail at prices substantially less than those above mentioned. It is not contended by the plaintiff that the defendant has ever executed a "fair trade" agreement with it or with any of its distributors. It is the contention of the plaintiff that by virtue of the "non-signer" provisions of Section 6 of Act 92 of 1937, all retailers of Prestone in Arkansas are required to sell the product at the prices prescribed by the agreement between the distributor and the one retailer above mentioned. The full text of Section 6 will be hereinafter set forth.

Plaintiff next alleges that the defendant's sales of Prestone below the prescribed prices are causing and will continue to cause the plaintiff to suffer irreparable damage to its property rights, and that unless defendant is enjoined, plaintiff's entire price structure, particularly in Arkansas, will be jeopardized and plaintiff's business irreparably damaged and its good will and property rights in its trade-mark irreparably harmed. It is further alleged that plaintiff has no adequate remedy at law, and that the defendant should be temporarily and permanently enjoined from selling Prestone at less than the prescribed prices; as stated, plaintiff also seeks declaratory relief.

In its original answer the defendant admitted that the plaintiff is the owner

---

1. Act 92 of 1937, now codified as Ark.Stats.1947, Sections 70–201 to 70–208.

of the trade-mark "Prestone"; admitted that plaintiff manufactures, distributes and sells its product under said trade-mark in fair and open competition with similar products sold by others; admitted the execution of the "fair trade" agreement mentioned in the complaint, and that it had received notice thereof; and admitted that it had sold Prestone below the prices prescribed in said agreement. It alleged, however, that the plaintiff itself, acting through the Crow-Burlingame Company, one of its agents in Arkansas, had sold Prestone at retail at prices below those prescribed in the agreement, which action, defendant contends, amounted to a waiver and estoppel; it was further alleged that an enforceable contract is a prerequisite to the operation of the Arkansas statute, and that the exception in the agreement relied upon by the plaintiff in favor of sales to consumers "for industrial or fleet use" is so vague and indefinite as to render the contract unenforceable. It was further alleged that said exception was not authorized by the statute, and that its inclusion in the agreement was a deviation from the statute and rendered the contract void.

In addition to these allegations, the defendant, in its original answer and in two amendments thereto, alleged that Section 6 of the Act[2], as applied to the defendant, a non-signer, was violative of the due process clause of the 14th Amendment to the Constitution of the United States and of several provisions of the Constitution of the State of Arkansas[3]; and it was further alleged that the entire Act was invalid at the time it was passed as being in conflict with the Sherman Anti-Trust Act[4] and with the commerce clause of the Constitution of the United States, art. 1, § 8, cl. 3, and that since it had never been re-enacted, its initial invalidity had not been cured by the passage of the Miller-Tydings Act, Act of August 17, 1937, c. 690, Title VIII, 50 Stat. 693, 15 U.S.C.A. § 1, or the McGuire Act, Act of July 14, 1952, c. 745, Sec. 2, 66 Stat. 632, 15 U.S.C.A. § 45.

■ The facts in the case are not in serious dispute, and are in substance as follows:

The plaintiff is the manufacturer of Prestone, as has been said, which it markets at wholesale in Arkansas and elsewhere through distributors or consignees. The defendant is engaged in the retail hardware business at Batesville, Arkansas, and during 1952 and 1953 it acquired a quantity of Prestone and has been retailing it in sealed cans at prices less than the prescribed "fair trade" prices. In order to understand the controversy between the parties and the alleged impact of the defendant's sales practices upon the business and good will of the plaintiff, it should be pointed

2. Section 6 is as follows: "Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of this act, *whether the person so advertising, offering for sale or selling is or is not a party to such contract*, is unfair competition and is actionable at the suit of any person damaged thereby." (Emphasis added.)

3. The Arkansas constitutional provisions which defendant claims that Section 6 of the Act violates are Article 2, §§ 2, 8, 18, 19 and 29 of the Constitution of 1874. Section 2 in part provides that, "All men are created equally free and independent, and have certain inherent and inalienable rights, amongst which are those of enjoying and defending life and liberty; of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness. * * *" Section 8, the Arkansas "due process" clause, provides among other things that no person shall be deprived of life, liberty or property without due process of law. Section 18 prohibits the Legislature from according to any citizen or class of citizens any privileges or immunities which are not upon the same terms equally available to all citizens. Section 19 prohibits perpetuities and monopolies; and Section 29 provides that the recitation of specific rights in the preceding clauses "shall not be construed to deny or disparage others retained by the people".

4. Thus violating the "supremacy clause" of the Federal Constitution; U.S.Const. Article 6, Clause 2.

out that Prestone, or any other anti-freeze for that matter, normally reaches the ultimate consumer by means of a sale to him at retail at a filling station or garage. It is a matter of common knowledge, and the evidence here shows, that there is more to installing anti-freeze in an automobile than simply draining the water out of the radiator and replacing it with anti-freeze; in addition to these steps it is necessary to check and usually tighten hose connections in order to prevent waste before the solution is poured into the radiator, and thereafter to test the solution in the radiator to determine whether or not the freezing point thereof is sufficiently low. When an automobile owner buys anti-freeze in a normal transaction, the filling station operator performs all steps necessary to complete installation thereof, and the charge for his service is included in the purchase price of the product. The defendant, however, does not make a practice of installing Prestone in the automobiles of its customers; when it makes a retail sale, the purchaser is responsible for his own installation, and as he is generally not equipped to perform the various steps outlined above, he usually takes the product to the filling station where he regularly trades and requests the operator to install it for him gratis. Since Prestone is a well known anti-freeze, the probabilities are that the filling station operator to whom the purchaser goes will have on display Prestone which he himself has bought and paid for in advance [5], and which he is expected to re-sell at the established price. Human nature being what it is, the filling station operator, desirous of maintaining good customer relations and good will, is generally reluctant to refuse to install anti-freeze for one who has bought it elsewhere, particularly in cases where the purchaser is one of his regular customers [6]. Under such circumstances it is easy to see how a filling station operator within the Batesville trade area would find it unprofitable to handle and install Prestone at "fair trade" prices in competition with defendant's over the counter retail sales, and would be tempted to discontinue to handle the product. And this, according to the undisputed testimony of Mr. Floyd E. Ward, one of the Crow-Burlingame salesmen, a considerable number of operators of filling stations in said trade area have threatened to do. While there is no showing as to how much, if any, business the plaintiff has actually lost up to this time as a result of the defendant's practices, it is clear that it is threatened with a substantial loss of business in the Batesville area if the defendant's sales continue; and, moreover, it is obvious that if the defendant is permitted to ignore the prescribed price schedules, other merchants throughout the state will do the same, to the plaintiff's very great financial loss.

With respect to the defendant's claim that the exception contained in the "fair trade" agreement in favor of sales to consumers "for industrial or fleet use" is so vague and indefinite as to render the contract unenforceable, the undisputed evidence shows that the quoted phrase has and has had for many years a definite meaning in the trade; as understood by those engaged in the business, a sale to a consumer "for industrial or fleet use" is a sale to a purchaser for installation in his own equip-

5. While the evidence shows that plaintiff places its product with wholesalers on consignment or upon an agency basis, paying them a commission on sales and a warehousing fee, it seems that retailers are required to pay in advance for Prestone which they purchase for re-sale. In other words, a filling station operator who fails to sell all of the Prestone which he buys must stand the loss or at least the expense of carrying it over to another season.

6. According to the testimony of Mr. B. E. Smith, Sales Manager for Crow-Burlingame, the situation would not be cured from the filling station operator's standpoint even if he could charge and collect a fee for installing Prestone since in order to handle it successfully such operator must not only earn a fee for his labor but also sell the product at a profit.

ment, the customer maintaining regular facilities for such installation. While, as indicated, the individual automobile owner usually depends upon a filling station operator to install his anti-freeze, just as he depends upon such operator to look after his car in other ways, there are many owners of motor vehicles who for a variety of reasons find it more practical to service and maintain their own vehicles, and who have facilities for that purpose. Such owners may maintain their own fuel tanks, lubricate their vehicles on their own racks, change the oil in said vehicles themselves, make repairs thereto, and install their own anti-freeze, performing in the latter process the several steps which the filling station operator ordinarily performs for the individual motorist. Generally, when we consider this type of owner, we envisualize a truck line, a taxicab company, or a mercantile concern operating a number of delivery vehicles; but it must be remembered that while most motor vehicles are operated on the streets and highways, there are a number of types of such vehicles which are not normally operated on the highway at all, as, for example, farm tractors. The owner of one or more tractors or other types of motor propelled farm vehicles may have occasion to maintain his own servicing facilities and to install his own anti-freeze. Furthermore, the use of anti-freeze is not limited to motor vehicles; it is also used in any type of engine which is liquid cooled; since many of such engines are entirely stationary, the owner thereof must of necessity do his own installing. Where sales are made to owners falling within the categories just mentioned, they are considered as sales for industrial or fleet use. In this connection it may be said that the term "fleet use" is, in a sense, a misnomer since the word "fleet" suggests a number of vehicles; the undisputed evidence before us, however, is to the effect that in determining which purchasers are fleet users the number of vehicles owned is immaterial; the controlling question is whether or not the purchaser maintains regular facilities for installing the anti-freeze himself.

As pointed out, one of the contentions of the defendant is that the Crow-Burlingame Company, which defendant asserts to have been the agent of the plaintiff [7], has itself sold Prestone at retail at less than "fair trade" prices, and that for this reason the plaintiff has waived its right to insist upon its price schedules or is estopped to assert any claim for relief against the defendant. On this point the evidence shows that the business of Crow-Burlingame is principally that of a wholesaler; while the evidence reflects a number of sales of Prestone made by Crow-Burlingame in the Batesville area, which sales were apparently made to ultimate consumers, at prices less than those prescribed, it further appears that most, if not all, of these sales were for industrial or fleet use, as that term is understood in the trade or fell within other allowed exceptions. It is, of course, possible that the employees of Crow-Burlingame may have inadvertently made some isolated retail sales at sub-standard prices which were not allowed under the terms of the agreement; but to our mind there has been no showing that such sales were made deliberately, or fraudulently, or in bad faith, or with any intent to evade the price schedules. Nor is there any showing that plaintiff itself ever had any actual knowledge of, or in any way condoned such sales, if they were in fact made.

In view of the fact that the term "industrial or fleet use" has a definite and well defined meaning in the trade, we must reject the defendant's contention that the inclusion of this term in the agreement between 555, Incorporated and Butler's Esso Service rendered that agreement void for uncertainty. Likewise, under the evidence in this case we must reject the defendant's

---

7. We find it unnecessary to definitely characterize the precise relationship between plaintiff and Crow-Burlingame.

claim of waiver and estoppel. In this connection we do not overlook the fact that the very nature of "fair trade" legislation requires the owner of a trademark, copyright, or patent to act fairly and without discrimination toward all of his distributors and dealers, and that it is a well settled rule that if his conduct in permitting violations of price schedules by particular dealers amounts to discrimination, he cannot obtain equitable relief against any particular dealer. This is nothing more than an application of the maxim that "he who seeks equity must do equity", and of the rule that "he who comes into equity must come with clean hands". Moreover, continued acquiescence in violations by one or more dealers or distributors may amount to a waiver or abandonment of the owner's right to enforce minimum price schedules. Hutzler Bros. Co. v. Remington Putnam Book Co., 186 Md. 210, 46 A.2d 101, 163 A.L.R. 884; see also the annotation in 163 A.L.R. 889 et seq. following the cited case. On the other hand, the mere fact that some dealers or distributors may violate the schedules does not, standing alone, furnish a valid defense to one dealer who is being sued; nor is it necessary that the owner sue all of his dealers or distributors simultaneously; it is sufficient if in suing one he appears to be acting with ordinary diligence and in good faith. Ibid. As indicated, there is nothing in the record before us to justify a conclusion that either Crow-Burlingame or the plaintiff has deliberately violated the price schedules, or has been guilty of any fraud, bad faith, or discrimination.

 Nor can we agree that the inclusion in the "fair trade" agreement here in question of an exception not expressly authorized by the Act vitiated said agreement. Section 5 of the Act, Ark.Stats. Sec. 70–205, in effect provides for four mandatory exceptions to all "fair trade" agreements[8]; but we find nothing in the statute which precludes the parties from providing for other reasonable exceptions to the schedules. Such was the holding in General Electric Co. v. Klein-on-the-Square, Inc., Sup., 121 N.Y.S.2d 37, where the "fair trade" agreement under consideration contained, as does the agreement in the instant case, an exception in favor of sales to employees, which exception is not mentioned in either the New York or the Arkansas statute. It should be noted in this connection that the defendant has the same right to sell at less than prescribed prices under certain conditions and to certain classes of customers as have Butler's Esso Service, Crow-Burlingame, or any other dealer or distributor.

 With respect to the defendant's contention that the Arkansas statute is violative of the due process clause of the 14th Amendment, little need be said. In the cases of Old Dearborn Distributing Co. v. Seagram-Distillers Corporation, 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109, and The Pep Boys, Manny, Moe & Jack of California, Inc., v. Pyroil Sales Co., Inc., 299 U.S. 198, 57 S.Ct. 147, 81 L. Ed. 122, the Supreme Court held that the "fair trade" statutes of Illinois and California, respectively, which were in all material respects similar to that of Arkansas, did not, as applied to nonsigners such as the defendant here, violate either the due process or the equal protection clause of the 14th Amendment[9]; and in the very recent case of

---

8. These exceptions are as follows: (a) Sales made by a dealer while in good faith closing out his stock with the intention of discontinuing to handle the commodity. (b) Sales of the commodity after removal or total obliteration of the trade-mark, brand, or name, and without reference to such trade-mark, brand, or name in connection with the advertisement, or sale of the commodity. (c) Sales of altered, second-hand, damaged, or deteriorated commodities, due notice of the nature of such commodities being given to the public. (d) Sales made by any officer acting under court order.

9. That reasonable legislative price fixing is not violative of the 14th Amendment was recognized by the Supreme Court in a five to four decision in Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940.

Schwegmann Bros. Giant Super Markets v. Eli Lilly & Co., 5 Cir., 205 F.2d 788, certiorari denied 346 U.S. 856, 74 S.Ct. 71, it was held that the authority of Old Dearborn was not impaired by the holding of the Supreme Court in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384 [10], 71 S.Ct. 745, 95 L.Ed. 1035. While, of course, we are not bound by the decision of the Court of Appeals for the Fifth Circuit, we do not feel justified in declining to follow it, particularly since no contrary decision has been cited to us, and we have found none.

This brings us to the contention of the defendant that Section 6 of the Arkansas Statute, as applied to it, violates the provisions of the Arkansas constitution which have been mentioned, and to its further contention that the Arkansas statute, which antedated both the Miller-Tydings Act and the McGuire Act, was invalid when enacted, and that since it has never been re-enacted, it is still invalid, notwithstanding the passage of the two federal statutes just mentioned [11]. Both of these contentions raise Arkansas constitutional questions which have not been squarely decided by the Supreme Court of Arkansas.

If we were compelled at this time to decide these questions, we would probably be constrained to agree with the defendant with respect to both of them. As to the contention that Section 6 violates the clauses of the Arkansas constitution set forth in the defendant's pleadings, it may be said that while the Supreme Court of Arkansas has never been called upon to determine the constitutional validity of this, or any other section of Act 92 of 1937, it has had occasion in two instances to pass upon the validity of other price fixing statutes under the Arkansas constitution, and in both cases it has used language which leads us to the almost irresistable conclusion that if and when it is called upon to determine the validity of Section 6 as applied to a non-signer, it will hold that said Section violates the clauses of the Arkansas constitution upon which the defendant relies. Noble v. Davis, 204 Ark. 156, 161 S.W.2d 189, Gipson v. Morley, 217 Ark. 560 [12], 233 S.W.2d 79. With regard to defendant's contention that the initial invalidity of the Arkansas statute has not been cured by the passage of the federal statutes above referred to, it appears that there are no Arkansas cases in point. Defendant cites, however, the case of Grayson-Rob-

---

10. In Schwegmann Brothers v. Calvert Distillers Corp., supra, the Supreme Court held that the Miller-Tydings Act, supra, did no more than remove from the scope of the anti-trust laws "fair trade" agreements as applied to the parties signatory thereto, and did not validate such agreements as applied to non-signers. It was to reach non-signers that the McGuire Act, supra, was enacted. See Schwegmann Bros. Giant Super Markets v. Eli Lilly & Co., supra, 205 F.2d 788, 790, footnote 3.

11. That the Arkansas statute was invalid when passed as contravening the Sherman Anti-Trust Act seems clear from the decisions of the Supreme Court in Schwegmann Bros. v. Calvert Distillers Corp., supra, and in Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502, the case last cited having been decided long prior to the passage of the Miller-Tydings Act.

12. Noble v. Davis involved the validity of Act 432 of 1941 which authorized the State Board of Barber Examiners to fix the prices to be charged by barbers for their services; a unanimous court held said Act to be invalid under the Arkansas constitution. It should be noted that the Court reached this decision with full recognition that Nebbia v. People of State of New York, supra, had held that reasonable price fixing was not violative of the federal constitution. Gipson v. Morley upheld the validity of Act 282 of 1949, which in effect fixed the resale price of intoxicating liquor; the decision was based, however, solely upon the fact that the commodity involved was liquor, over the sale of which the state has somewhat plenary powers; the Court expressly recognized the force of Noble v. Davis and distinguished it on the ground that the business of barbering was one of "common right", whereas the sale of whiskey was a mere privilege.

**550**

inson Stores v. Oneida, 209 Ga. 613, 75 S.E.2d 161, which is in point and which supports said contention. Plaintiff, on the other hand, cites General Electric Co. v. Packard Bamberger & Co., Inc., N.J., 102 A.2d 18, which is likewise in point and which holds directly to the contrary. Were we required to choose at this time between those two decisions, we would probably follow that of the Supreme Court of Georgia as being, to our mind, the better reasoned of the two, and the one which we think that the Supreme Court of Arkansas would probably follow, particularly in view of its attitude toward price fixing statutes as expressed in Noble v. Davis and Gipson v. Morley, both supra.

 It must be recognized, however, that the final decision of the questions now under consideration does not rest with us or with any other federal court; said questions are of state constitutional law, and the last word as to them must come from the Supreme Court of Arkansas. Regardless of how we might decide these questions, our decision would be but a forecast of how, to our mind, the Supreme Court of Arkansas would decide them, which forecast could be immediately overturned by an authoritative decision of that court. Such federal forecasts of state law are undesirable, particularly in equitable actions, such as this, wherein the granting or withholding of relief rests, at least in some measure, within the discretion of the court, and wherein there is more flexibility in the moulding of remedies than is found in actions sounding purely in law. Railroad Comm. of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971; cf. Harlow v. Ryland, 8 Cir., 172 F.2d 784. It should be further recognized that while, in a sense, the Arkansas Fair Trade Act does not particularly affect the political policy of the state, it has a profound effect upon its economic policy, and the impact upon Arkansas business of a holding by this Court that Section 6 of said Act is unconstitutional might be a serious one and could affect not only Arkansas busi-

ness men but also manufacturers and merchants all over the United States who market in Arkansas products eligible for protection under said Act. In this connection we recall a statement made by counsel for the plaintiff that he was of the opinion that there were at that time probably $50,000,000 worth of "fair traded" commodities in this state.

 Under such circumstances we believe that the course of procedure prescribed by the Supreme Court in Railroad Commission of Texas v. Pullman Co., supra, should be followed here. That was a suit for an injunction to restrain the enforcement of an order of the Railroad Commission of the State of Texas which the plaintiffs contended was violative of the Constitution of the United States; preliminary to the constitutional issue was the question of whether or not the Commission, as a matter of state law, had the power to issue the order, and on this question the courts of Texas had not passed. The three judge district court decided that the order was not authorized by the Texas statutes and enjoined its enforcement; the Railroad Commission appealed directly to the Supreme Court, and the latter court reversed and remanded the case to the district court to be retained "pending a determination of proceedings, to be brought with reasonable promptness in the state court * * *." The Court said:

"* * * The lower court did deny that the Texas statutes sustained the Commission's assertion of power. And this represents the view of an able and experienced circuit judge of the circuit which includes Texas and of two capable district judges trained in Texas law. Had we or they no choice in the matter but to decide what is the law of the state, we should hesitate long before rejecting their forecast of Texas law. But no matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination. The last word on the meaning of Article 6445 of the Texas

Civil Statutes, and therefore the last word on the statutory authority of the Railroad Commission in this case, belongs neither to us nor to the district court but to the supreme court of Texas. In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication. * * * The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication.

"An appeal to the chancellor, * * * is an appeal to the 'exercise of the sound discretion, which guides the determination of courts of equity'. Beal v. Missouri Pac. R. Co. [ante] 312 U.S. 45, 61 S.Ct. 418, 421, 85 L.Ed. [577] * * *. The history of equity jurisdiction is the history of regard for public consequences in employing the extraordinary remedy of the injunction. There have been as many and as variegated applications of this supple principle as the situations that have brought it into play. See * * * Beasley v. Texas & Pacific Ry. Co., 191 U.S. 492, 24 S.Ct. 164, 48 L.Ed. 274; City of Harrisonville v. [W. S.] Dickey Clay [Mfg.] Co., 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208; United States [ex rel. Greathouse] v. Dern, 289 U.S. 352, 53 S.Ct. 614, 77 L. Ed. 1250. Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, whether the policy relates to the enforcement of the criminal law, Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927; Spielman Motor Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L. Ed. 1322; or the administration of a specialized scheme for liquidating embarrassed business enterprises [Commonwealth of] Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L. Ed. 841; or the final authority of al state court to interpret doubtful regulatory laws of the state, Gilchrist v. Interborough, 279 U.S. 159, 49 S.Ct. 282, 73 L.Ed. 652; cf. Hawks v. Hamill, 288 U.S. 52, 61, 53 S.Ct. 240, 243, 77 L.Ed. 610. These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion', restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary. * * * This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of those powers. * * *'" 312 U. S. at page 499–501, 61 S.Ct. at pages 644–645.

It is earnestly contended on behalf of the plaintiff that this is not a proper case for the application of the rule announced in the Pullman Company decision, and in this connection counsel cites and principally relies upon Meredith v. City of Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9; Cohen v. Beneficial Indus. Loan Co., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528, and Food Fair Stores, Inc. v. Food Fair, Inc., 1 Cir., 177 F.2d 177. It is further argued that said rule is only applicable where a plaintiff attacks a state statute as unconstitutional in a federal court, and does not apply where, as here, the constitutional question is raised by a defendant; and it is still further contended that to remit the parties to the state court will either deprive the plaintiff of the benefit of our decision with respect to the factual issues in the case or will result in piecemeal litigation. We cannot agree with any of these contentions.

We do not stop now to analyze in detail the cases cited by the plaintiff which are mentioned above. The Winter Haven case does hold, as the plaintiff states, that the procedure prescribed in the Pullman case is not to be followed in every case in federal court which involves a question of state law, or simply

because the question may be difficult, but should be limited to exceptional cases. We think that the instant case is exceptional, however, by reason of the effect which a decision that Section 6 violates the Arkansas constitution would have upon business in the State of Arkansas, an effect which has already been mentioned. In this connection we might point out that we do not believe that the list of circumstances under which a federal court will withhold its decision pending adjudication in the state courts which was set out in the Pullman case was intended as being exclusive; on the contrary, it will be recalled that the Court referred to the principle as being a supple one which has had "as many and as variegated applications * * * as the situations that have brought it into play." Moreover, in the Winter Haven case the court was not called on to declare a state statute unconstitutional, but merely to pass upon the validity of an action taken by a city council with respect to a local bond issue, a matter which was of primary concern only to the parties before the court; that case did not have the wide public interest or significance that is possessed by the instant case.

In Cohen v. Beneficial Indus. Loan Co., supra, the federal court did uphold a state statute as against the contention that it was violative of the state constitution, but apparently no question was raised by any one at any stage of the proceedings as to whether or not such question should be first litigated in the state courts; it may also be observed that ordinarily no friction within our federal system arises when a federal court upholds a state statute; the situation which the Court was anxious to avoid in the Pullman case arises where a federal court strikes down a state statute, and, as indicated, we are of the strong opinion that if called upon to decide these constitutional questions, we would hold Section 6 invalid. Food Fair Stores, Inc. v. Food Fair, Inc., supra, did not involve a constitutional question at all, but solely a question of the proper construction of a Massachusetts statute in a case which does not appear to have been of interest to any but the immediate parties.

As to the contention that the principle under consideration is only applicable where the question of state constitutionality of a statute is raised by a plaintiff, we fail to see wherein it is material which side makes the constitutional challenge. In the instant case the constitutional questions, which have been implicit in the case from the moment that it was filed, have been expressly raised and in view of our findings must be decided somewhere before the litigation can be disposed of. We do not feel that we should decide them without at least affording an opportunity for them to be passed upon authoritatively by the state courts.

The remaining contentions of the plaintiff require little comment; we do not feel that by remitting plaintiff to the state court we are ousting ourselves of jurisdiction with respect to any questions which we should at this time decide. As is apparent from what has been said, we have already decided all of the factual and legal issues in the case with the exception of the state constitutional questions, and we are filing contemporaneously with this memorandum findings of fact and conclusions of law covering all issues except those last mentioned. The only questions which we contemplate being litigated in the state courts are the constitutional questions[13]. Nor do we think that it will be burdensome upon or expensive to the parties to litigate those questions in the state court since they are purely legal in nature, all of the factual elements in the case having been disposed of.

Findings of fact and conclusions of law covering the issues which we have decided are today being filed, together

[13]. The Arkansas courts of course have jurisdiction to afford injunctive relief; and they now have authority to grant declaratory relief by virtue of Act 274 of 1953.

with an order retaining this case on the docket without final disposition and allowing the plaintiff 20 days, which we consider to be a reasonable time, to commence appropriate action in the state courts looking to a determination therein of the state constitutional questions here involved, the plaintiff to report to the Court at or before the expiration of said 20-day period the action, if any, which it has taken in this connection.